93 Cal.Rptr.2d 1 (2000)
22 Cal.4th 352
993 P.2d 334
LOS ANGELES ALLIANCE FOR SURVIVAL et al., Plaintiffs and Respondents,
v.
CITY OF LOS ANGELES et al., Defendants and Appellants.
No. S073451.
Supreme Court of California.
March 2, 2000.
James K. Hahn, City Attorney, Frederick N. Merkin, Byron R. Boeckman and Debbie Lew, Assistant City Attorneys, and Candice I. Horikawa, Deputy City Attorney, for Defendants and Appellants.
*2 Louise H. Renne, City Attorney (San Francisco), Thomas J. Owen, Deputy City Attorney; and Mara E. Rosales for City and County of San Francisco, County of Sacramento, Port of Oakland and Port of San Diego as Amici Curiae on behalf of Defendants and Appellants.
Munger, Tolles & Olson, Marc A. Becker, Los Angeles, and Jeremy B. Rosen, for Center for the Community Interest, 77 California Cities and Central City Association of Los Angeles as Amici Curiae on behalf of Defendants and Appellants.
Kent S. Scheidegger, for Criminal Justice Legal Foundation as Amicus Curiae on behalf of Defendants and Appellants.
ACLU Foundation of Southern California, Mark D. Rosenbaum, Peter J. Eliasberg, Los Angeles, Barbara J. Antonio; Karl Manheim; Law Office of Carol A. Sobel, Carol A. Sobel, Santa Monica; and William B. Rubenstein for Plaintiffs and Respondents.
Maria Foscarinis and Catherine Bendor, for the National Law Center on Homelessness & Poverty as Amicus Curiae on behalf of Plaintiffs and Respondents.
Law Offices of David M. Liberman, David M. Liberman, Los Angeles, and Deborah Zexter, for One World One Family Now, Inc., as Amicus Curiae on behalf of Plaintiffs and Respondents.
Levy, Ram & Olson, Karl Olson, San Francisco; and Alice Neff Lucan, Washington, District of Columbia, for California Newspapers Publishers Association as Amicus Curiae on behalf of Plaintiffs and Respondents.
McCutheon, Doyle, Brown & Enersen, Charles Crompton III, Frank Kennamer, Meghan Rhea, San Francisco; and Judith Appel, San Francisco, for the Coalition on Homelessness and the Street Spirit as Amici Curiae on behalf of Plaintiffs and Respondents.
GEORGE, C.J.
We granted the request of the United States Court of Appeals for the Ninth Circuit (Ninth Circuit) for certification pursuant to California Rules of Court, rule 29.5 (rule 29.5), to address an important issue of state law: What is the proper standard under article I, section 2, subdivision (a) of the California Constitution (hereafter article I, section (2)(a), or liberty of speech clause) for analyzing the constitutionality of ordinances governing the public solicitation of funds, i.e., in-person requests for the immediate donation or payment of money, such as City of Los Angeles Ordinance No. 171664?
Plaintiffs contend that ordinances that single out such solicitation for distinct treatment should be viewed as "content-based" regulations (and hence constitutionally suspect), and may be upheld under the California liberty of speech clause only if the regulation satisfies the very stringent "strict scrutiny" standard. In contrast, defendants contend that such ordinances should not be considered content based under the California Constitution, and instead should be evaluated under the less-stringent "intermediate scrutiny" standard that California decisions traditionally have applied to "time, place, and manner" regulations of speech-related activity.
As we explain, this court's decisions dating back more than 80 years have recognized that requests for the immediate donation or payment of money  while often encompassed within and protected by the liberty of speech clause  may create distinct problems and risks that warrant different treatment and regulation. These precedents are inconsistent with plaintiffs' claim that statutes or ordinances are to be viewed as constitutionally suspect simply because they are directed at such solicitation alone and do not apply to other forms of speech-related activity. Although some recent decisions of the California and federal intermediate appellate courts have concluded that, under the California Constitution, ordinances directed at *3 solicitation should be viewed as content based and, for that reason, must satisfy the strict scrutiny test, those decisions rest on an erroneously literal interpretation of the phrase "content based" and fail to take into account long-established California decisions upholding ordinances or regulations that impose distinct rules or requirements upon activity involving the solicitation of funds.
Accordingly, we conclude that an ordinance (such as the Los Angeles ordinance at issue in the underlying action) that is directed at activity involving public solicitation for the immediate donation or payment of funds should not be considered content based or constitutionally suspect under the California Constitution, and should be evaluated under the intermediate scrutiny standard applicable to time, place, and manner regulations, rather than under the strict scrutiny standard.

I.
The pertinent facts are stated in the certification request of the Ninth Circuit (Los Angeles Alliance for Survival v. City of Los Angeles (9th Cir.1998) 157 F.3d 1162, 1163-1164 (Los Angeles Alliance I)) as follows:
"On July 2, 1997, the Los Angeles City Council enacted Ordinance No. 171664 entitled `Prohibition Against Certain Forms of Aggressive Solicitation,' codified as Los Angeles Municipal Code § 41.59. The ordinance ... went into effect August 15, 1997. The stated goal of the ordinance is `to protect citizens from the fear and intimidation accompanying certain kinds of solicitation that have been an unwelcome and overwhelming presence in the city.' The ordinance prohibits two kinds of solicitations `aggressive solicitations' in all locations, § 41.59(b), and all solicitations in specific locations, § 41.59(c)....
"[Plaintiffs] are groups and individuals that solicit immediate donations of money from members of the public on public fora throughout the City of Los Angeles. On September 11, 1997, [plaintiffs] brought an action for injunctive and declaratory relief to enjoin enforcement of the ordinance on the grounds that it violates the First and Fourteenth Amendments of the United States Constitution and the Liberty of Speech Clause of the California Constitution. [Plaintiffs] then requested a preliminary injunction which the district court granted on November 5, 1997.
"The district court rejected [defendants'] argument for Pullman abstention [ (Railroad Commission of Texas v. Pullman (1941) 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971) ], concluded that [plaintiffs] were likely to succeed on the merits of their claim and found that [defendants] had conceded irreparable harm for purposes of the preliminary injunction. Relying on the California appellate decision in Alternatives [for California Women, Inc. v. County of Contra Costa (1983) 145 Cal.App.3d 436, 193 Cal.Rptr. 384 (Alternatives) ] and on the Ninth Circuit's decision in Carreras [v. City of Anaheim (9th Cir.1985) 768 F.2d 1039 (Carreras) ], the district court held that the ordinance was content-based under the California Liberty of Speech Clause [ (and hence subject to strict, rather than intermediate, scrutiny) ].... [Defendants] timely appealed the grant of the preliminary injunction to the Ninth Circuit." (Fns.omitted.)

II.

A.
The Ninth Circuit explained the need for certification in this matter as follows:
"The answer to the certified question will resolve a critical issue of whether the California Constitution's Liberty of Speech Clause grants greater protection to speech used in conjunction with solicitation than does the First Amendment of the United States Constitution. Under federal constitutional law, regulations of solicitation are reviewed as content-neutral restraints of speech. See, e.g., United States v. Kokinda, 497 U.S. 720, 730 [110 S.Ct. 3115, 111 L.Ed.2d 571] (1990) [ (Kokinda) ]. In contrast, *4 the California appellate court decision in Alternatives [, supra, 145 Cal. App.3d 436, 193 Cal.Rptr. 384,] ... [held] that regulations of solicitation are reviewed as content-based restraints of speech under the Liberty of Speech Clause of the California Constitution [and hence subject to strict scrutiny].
".......................
"[Subsequent to Alternatives, supra, 145 Cal.App.3d 436, 193 Cal.Rptr. 384, but prior to Kokinda, supra, 497 U.S. 720, 110 S.Ct. 3115, the court in Carreras, supra, 768 F.2d 1039,] ... found that `Alternatives ... is most plausibly interpreted as independently grounded on the California Liberty of Speech Clause.' 768 F.2d 1039, 1048 n. 21.... Applying Alternatives, the [Carreras ] court found that an ordinance [regulating solicitation] was contentbased under the California Constitution [and hence subject to strict scrutiny]. Id. at 1048.
".... We must determine whether [Alternatives, supra, 145 Cal.App.3d 436, 193 Cal.Rptr. 384, and Carreras, supra, 768 F.2d 1039, or Kokinda, supra, 497 U.S. 720, 110 S.Ct. 3115, properly reflects] the Supreme Court of California's interpretation of California's Liberty of Speech Clause, a critical issue in the appeal before us." (Los Angeles Alliance I, supra, 157 F.3d 1162, 1164-1165.)
Finally, the Ninth Circuit stated that no decision of the California Supreme Court addresses whether "regulation of solicitation is content-neutral or content-based," and it asserted that the California Court of Appeal cases on that issue "present conflicting views." (Los Angeles Alliance I, supra, 157 F.3d 1162, 1165.)[1]

B.
The Ninth Circuit's certification request formulated the question to be addressed as follows: "Is an ordinance that seeks to regulate the time, place and manner of solicitation of money or other thing of value or the sale of goods or services content based under the Liberty of Speech Clause of the California Constitution? Cal. Const, art. I, § 2." (Los Angeles Alliance I, supra, 157 F.3d 1162, 1162-1163.) The certification request also specified, however, that its "phrasing of the question should not restrict [this] Court's consideration of the issue involved." (Id., at p. 1163.)
The Ninth Circuit concluded: "Although we currently have under review the grant of a preliminary injunction, certification is proper because the challenge to the regulation is a facial one and so there are no additional facts relevant to the certified question to be litigated before the district court. The answer to the certified question may be determinative of the cause *5 pending before this panel. [¶] This court agrees to follow the answer provided by the California Supreme Court." (Los Angeles Alliance I, supra, 157 F.3d 1162, 1165.) Pursuant to rule 29.5, the Ninth Circuit ordered its clerk to "provide all relevant briefs and excerpts of record with this request and to forward all under the official seal of the Ninth Circuit...." (157 F.3d at p. 1165; see rule 29.5(c) & (d).)
We granted the certification request, and, at the same time, modified the certified question to read as follows: "What is the proper standard under article I, section 2(a) of the California Constitution for analyzing the constitutionality of ordinances governing solicitations, such as Los Angeles Ordinance No. 171664?"[2]

C.
Until the adoption of rule 29.5, effective January 1, 1998, California was one of the few states in the nation that did not accept certified questions of state law. Because this is the first instance in which we have accepted a request for certification, we make the following brief observations. Many commentators have noted the benefits of certification. The procedure: (i) allows federal courts to avoid mischaracterizing state law (thereby avoiding a misstatement that might produce an injustice in the particular case and potentially mislead other federal and state courts until the state supreme court finally, in other litigation, corrects the error); (ii) strengthens the primacy of the state supreme court in interpreting state law by giving it the first opportunity to conclusively decide an issue; (iii) avoids conflicts between federal and state courts, and forestalls needless litigation; and (iv) protects the sovereignty of state courts.[3] (See, e.g., Braun, A Certification Rule for California (1996) 36 Santa Clara L.Rev. 935, 937-942 (Braun); Schneider, "But Answer Came There None": The Michigan Supreme Court and the Certified Question of State Law (1995) 41 Wayne L.Rev. 273, 299-301; see also Goldschmidt, Certification of Questions of Law: Federalism in Practice (1995 Amer. Judicature Soc'y.) pp. 3-10.)
The need for a certification procedure is well illustrated in this case by the above described history of Alternatives, supra, 145 Cal.App.3d 436, 193 Cal.Rptr. 384, and Carreras, supra, 768 F.2d 1039. In light of the Ninth Circuit's decision in Carreras, individuals and organizations that wish to challenge solicitation ordinances in California have every incentive to bring state constitutional challenges to such ordinances in federal district court, where they will receive the benefit of Carreras's holding that such ordinances are content based and hence subject to strict scrutiny under *6 the California Constitution.[4] Because Carreras is binding on the federal courts in California but not on California state courts, plaintiffs are unlikely to present this state claim in state court and risk a determination by a state court that Carreras was wrongly decided, when they are more likely to prevail, on the strength of Carreras, in federal district court. In this setting, the availability of a certification procedure provides the most expeditious, and, as a practical matter, perhaps the only effective, means to enable California, through its courts, to exercise the state's authority over the proper interpretation and application of article I, section 2(a), of its own Constitution.
The parties do not contest the constitutionality of the certification procedure embodied in rule 29.5. Sister courts in states with constitutions similar to the California Constitution uniformly have found that jurisdiction to entertain and decide certified questions, under a procedure adopted by rule or statute, is properly within the powers of a state supreme court. (E.g., In re Elliott (1968) 74 Wash.2d 600, 446 P.2d 347, 358 (Elliott); Sunshine Mining Co. v. Allendale Mut. Ins. (1983) 105 Idaho 133, 666 P.2d 1144, 1147-1148; see also Irion v. Glens Falls Insurance Company (1969) 154 Mont. 156, 461 P.2d 199, 203; see generally Braun, supra, 36 Santa Clara L.Rev. 935, 947-951.) Similarly, our sister-state high courts overwhelmingly have rejected contentions that in answering a certified question a court issues an improper advisory opinion. The weight of authority holds that a high court's answer to a certified question is not an improper advisory opinion so long as (i) a court addresses only issues that are truly contested by the parties and are presented on a factual record; and (ii) the court's opinion on the certified question will be dispositive of the issue, and res judicata between the parties. (See, e.g., Schlieter v. Carlos (1989) 108 N.M. 507, 775 P.2d 709, 710; Wolner v. Mahaska Industries, Inc. (Minn.1982) 325 N.W.2d 39, 41; Elliott, supra, 74 Wash.2d 600, 446 P.2d 347, 354-355; see generally Braun, supra, 36 Santa Clara L.Rev. 935, 947.)[5] No party or other entity asserts that we should conclude otherwise under the judicial article of our own Constitution.

III.
To place the present controversy in perspective, we first highlight significant aspects of the Los Angeles ordinance at issue in the federal proceeding.

A.
The ordinance and its preamble are set out in full in the appendix to this opinion. The preamble articulates the city's purposes: "[I]t is the intent of the Council in enacting this Ordinance to improve the quality of life and economic vitality of the City, and to protect the safety of the general public against certain abusive conduct of persons engaged in solicitation, by imposing reasonable manner and place restrictions on solicitation while respecting the constitutional rights of free speech for all citizens...."
The preamble also sets out a number of findings: First, "an increase in aggressive solicitation throughout the city has become extremely disturbing and disruptive to residents and businesses, and has contributed *7 not only to the loss of access to and enjoyment of public places, but also to an enhanced sense of fear, intimidation and disorder...." Second, "the presence of individuals who solicit money from persons at or near banks or automated teller machines is especially threatening and dangerous. Motorists also find themselves confronted by persons who without permission wash their automobile windows at traffic intersections, despite explicit indications by drivers not to do so. Such activity often carries with it an implicit threat to both person and property. People driving or parking on city streets frequently find themselves faced with panhandlers seeking money by offering to perform `services' such as opening car doors or locating parking spaces...." Finally, "the Council ... finds as abusive the solicitation of people in places where they are a `captive audience' in which it is impossible or difficult for them to exercise their own right to decline to listen to or to avoid solicitation from others. Such places include buses, subways, and trains; parking lots and structures; and indoor and outdoor dining areas. Restricting solicitation in such places will provide a balance between the rights of solicitors and the rights of persons who wish to decline or avoid such solicitations, and will help avoid or diminish the threat of violence in such unwarranted and unavoidable confrontations...."

B.
The ordinance is directed at those who "`[s]olicit, ask or beg'" by "using the spoken, written, or printed word, or bodily gestures, signs or other means with the purpose of obtaining an immediate donation of money or other thing of value...." (L.A.Ord. No. 171664, § 41.59, subd. (a)(1), italics added.) The measure also covers solicitation for the sale of "goods or services" (ibid.) which would appear to include the sale of books, newspapers, tracts, artwork, etc., as well as the sale of "services," such as the washing of automobile windows. It applies in "`public place[s],'" defined as places (whether publicly or privately owned) where the public is afforded access, including streets, sidewalks, parking lots, plazas, transportation facilities, schools, places of amusement, parks, and any portion of any business establishment. (Id., subd. (a)(2).)
Consistent with the city's stated purpose and findings, the ordinance covers two categories of solicitation. First, with respect to all public places covered by the ordinance, the legislation bans solicitation that is conducted in an "aggressive manner," which is defined in detail as approaching, speaking to, or following a person in a manner intended to cause or reasonably likely to cause fear of bodily harm or intimidation; intentionally touching in the course of soliciting; intentionally blocking or interfering with passage; using violent or threatening gestures; persisting in closely following after being informed that the person does not want to donate; or using profane, offensive, or abusive language likely to provoke an immediate violent reaction. (L.A.Ord. No. 171664, § 41.59, subd. (b)(2)(A)-(F).)
Second, the ordinance bans all solicitation in certain defined places (with specified exemptions): within 15 feet of banks and automated teller machines; directed at occupied motor vehicles located in a public place; in parking lots or structures after dark; in public transportation vehicles and within 10 feet of such vehicle stops; and in any outdoor or indoor dining area of a restaurant. (L.A.Ord. No. 171664, § 41.59, subd. (c)(1)-(4).)

IV.

A.
An ordinance such as the one here at issue plainly implicates the liberty of speech clause of the California Constitution. (People v. Fogelson (1978) 21 Cal.3d 158, 145 Cal.Rptr. 542, 577 P.2d 677 (Fogelson ) [ordinance regulating solicitation on city property posed an impermissible *8 restriction on speech under art. I, § 2].)[6] The circumstance that an ordinance regulates protected conduct does not in itself, however, render the ordinance invalid under the liberty of speech clause. California decisions long have recognized that even with regard to protected activity, a regulation may be enforceable if it survives the intermediate scrutiny of time, place, and manner analysis. As observed in Savage v. Trammell Crow Co. (1990) 223 Cal. App.3d 1562, 1572-1574, 273 Cal.Rptr. 302 (Savage), legislation will be upheld as a reasonable time, place, and manner regulation so long as it is (i) narrowly tailored, (ii) serves a significant government interest, and (iii) leaves open ample alternative avenues of communication. (See e.g., Dulaney v. Municipal Court (1974) 11 Cal.3d 77, 84-85, 112 Cal.Rptr. 777, 520 P.2d 1 (Dulaney).)[7]
As plaintiffs note, decisions applying the liberty of speech clause, like those applying the First Amendment, long have recognized that in order to qualify for intermediate scrutiny (i.e., time, place, and manner) review, a regulation must be "content neutral" (e.g., Savage, supra, 223 Cal.App.3d at p. 1573, 273 Cal.Rptr. 302), and that if a regulation is content based, it is subject to the more stringent strict scrutiny standard. (E.g., U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Laboratory (1984) 154 Cal. App.3d 1157, 1170, 201 Cal.Rptr. 837 (U.C. Nuclear Weapons).)[8] Plaintiffs, relying primarily upon Alternatives, supra, 145 Cal.App.3d 436, 193 Cal.Rptr. 384, contend that a regulation that singles out for distinct treatment public solicitation for immediate donation or payment of funds, and regulates only such activity and not any other expressive activity (such as the distribution of leaflets or public speechmaking), should be viewed as content based under the California Constitution, and hence should be subject to strict, rather than intermediate, scrutiny. Defendants, on the other hand, relying heavily upon the reasoning of a line of United States Supreme Court decisions (Lee, supra, 505 U.S. 672, 112 S.Ct. 2701; Kokinda, supra, 497 U.S. 720, 110 S.Ct. 3115; Heffron, supra, 452 U.S. 640, 101 S.Ct. 2559), assert that legislation like the Los Angeles ordinance here at issue should be designated content neutral, and hence properly may be reviewed under the California liberty of *9 speech clause by intermediate scrutiny under time, place, and manner analysis.

B.
In analyzing whether a regulation of solicitation should be viewed as content based or content neutral under the liberty of speech clause of the California Constitution, we begin with the unquestioned proposition that the California Constitution is an independent document and its constitutional protections are separate from and not dependent upon the federal Constitution, even when the language of the two charters is the same. (Cal. Const., art. I, § 24.) In this instance, the language of the relevant California constitutional provision differs from, and in some respects is broader than, the federal Constitution. Whereas the First Amendment to the United States Constitution, in relevant part, provides that government "shall make no law ... abridging the freedom of speech," article I, section 2(a), of the California Constitution reads: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right. A law may not restrain or abridge liberty of speech or press." This provision, often referred to as the "liberty of speech clause," was adopted without debate in the first California Constitution of 1849 (see Browne, Report of the Debates in The Convention of California on the Formation of the State Constitution (1850) pp. 41, 294, 458 (hereafter Browne, Report of the Debates (1850)), and has remained essentially unchanged since then.[9]
Most current state constitutions have similarly worded provisions,[10] and courts in these states frequently have observed that the language of their provisions is broader than that of the freedom of speech provision of the First Amendment. (E.g., State v. Linares (1995) 232 Conn. 345, 655 A.2d 737, 753-757; Davenport v. Garcia (Tex. 1992) 834 S.W.2d 4, 7-12; Mountain States Tel. v. Ariz. Corp. Com'n (1989) 160 Ariz. 350, 773 P.2d 455, 459-462; State v. Henry (1987) 302 Or. 510, 732 P.2d 9, 11; Alderwood Assoc. v. Wash. Envir. Council (1981) 96 Wash.2d 230, 635 P.2d 108, 115-116; State v. Schmid (1980) 84 N.J. 535, 423 A.2d 615, 626-627; Village of South Holland v. Stein (1940) 373 Ill. 472, 26 N.E.2d 868, 871.)[11]
*10 This court, and the California Courts of Appeal, likewise have indicated that the California liberty of speech clause is broader and more protective than the free speech clause of the First Amendment. (Dailey v. Superior Court (1896) 112 Cal. 94, 97-98, 44 P. 458 [the liberty of speech clause "is the broader, and gives ... greater liberty" than the First Amendment]; Griset v. Fair Political Practices Comm. (1994) 8 Cal.4th 851, 866, 35 Cal.Rptr.2d 659, 884 P.2d 116, fn. 5 ["As a general matter, the liberty of speech clause in the California Constitution is more protective of speech than its federal counterpart."]; Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501, 519, 217 Cal.Rptr. 225, 703 P.2d 1119 [liberty of speech clause is "`more definitive and inclusive than the First Amendment' "]; People v. Glaze (1980) 27 Cal.3d 841, 844, fn. 2, 166 Cal.Rptr. 859, 614 P.2d 291 [same]; Wilson v. Superior Court (1975) 13 Cal.3d 652, 658, 119 Cal.Rptr. 468, 532 P.2d 116 [same]; see generally Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908, 153 Cal.Rptr. 854, 592 P.2d 341; see also San Diego Unified Port Dist. v. U.S. Citizens Patrol (1998) 63 Cal.App.4th 964, 970, 74 Cal. Rptr.2d 364; Allred v. Shawley (1991) 232 Cal.App.3d 1489, 1496, 284 Cal.Rptr. 140; Gonzales v. Superior Court (1986) 180 Cal. App.3d 1116, 1123, 226 Cal.Rptr. 164; U.C. Nuclear Weapons, supra, 154 Cal.App.3d 1157, 1164, 201 Cal.Rptr. 837; Prisoners Union v. Department of Corrections (1982) 135 Cal.App.3d 930, 938, 185 Cal.Rptr. 634.)
Merely because our provision is worded more expansively and has been interpreted as more protective than the First Amendment, however, does not mean that it is broader than the First Amendment in all its applications.[12] In this regard, defendants acknowledge that the California Constitution is independent and that federal decisions interpreting the First Amendment are not controlling. They argue, however, that with respect to analysis of solicitation statutes, federal authorities are persuasive and are supportive of the treatment generally accorded by past California decisions.

C.

1.
We first describe the high court's test for determining content neutrality for purposes of the First Amendment. In deciding whether, under the First Amendment, a given regulation of speech or expressive activity is content based, and hence subject to strict scrutiny, or instead is content neutral, and hence subject to intermediate scrutiny (i.e., time, place, and manner analysis), the high court has stated that a restriction is content neutral if it is "justified without reference to the content of the regulated speech." (Clark v. Community for Creative Non-Violence (1984) 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221; see also Ward, supra, 491 U.S. 781, 791, 109 S.Ct. 2746; Cincinnati v. Discovery Network (1993) 507 U.S. 410, 428, 113 S.Ct. 1505, 123 L.Ed.2d 99.)
The high court's cases illuminate what it meant by this statement. Contrary to plaintiffs' view, these decisions do not require literal or absolute content neutrality, but instead require only that the regulation be "justified" by legitimate concerns that are unrelated to any "disagreement with the message" conveyed by the speech. (Ward, supra, 491 U.S. 781, 791, 109 S.Ct. 2746.) Moreover, the high court's decisions contemplate that a regulation will be found content neutral even if it may have disparate incidental effects on speakers based upon message content. As the court explained in Ward, "[a] regulation *11 that serves purposes unrelated to the content of the expression" (there, New York City's Central Park sound amplification restrictions designed to avoid undue intrusion into other areas of the park and surrounding neighborhoods) "is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (491 U.S. at p. 791, 109 S.Ct. 2746;[13] see also Williams, supra, 139 U.Pa. L.Rev. 615, 622-635 [describing and criticizing this "limited notion of content discrimination"].)
The three high court decisions that have addressed the question of content neutrality in the context of solicitation all have classified such laws as being content neutral, even though the laws at issue in those cases distinguished between speech that solicited the immediate donation of money and other protected speech, and thus were not totally unconcerned with the literal content of spoken or written words.
Heffron, supra, 452 U.S. 640, 101 S.Ct. 2559, concerned a regulation in a public forum, a state fair, that permitted the activities of conducting sales and soliciting funds only in designated booths. The regulation did not prevent an individual from walking about the grounds and communicating views to fair patrons in face-to-face discussions. (Id., at pp. 643-644, 101 S.Ct. 2559.) Even though the regulation at issue in Heffron made essentially the same distinction between solicitation and other speech that plaintiffs here assert is content based, the court in Heffron, with little analysis, held that the regulation was content neutral (id., at pp. 648-649, 101 S.Ct. 2559), and nothing in either of the two concurring and dissenting opinions took issue with that crucial holding. Indeed, Justice Brennan's separate opinion expressly joined the court's judgment "insofar as it upholds [the challenged] restriction on sales and solicitations" (id., at p. 657, 101 S.Ct. 2559 (cone. & dis. opn. of Brennan, J.)), and Justice Blackmun's separate opinion did likewise (id., at p. 663, 101 S.Ct. 2559 (cone. & dis. opn. of Blackmun, J.)). In this regard, Justice Blackmun noted the "common-sense differences between literature distribution, on the one hand, and solicitation and sales, on the other," and explained that "the latter activities present greater crowd control problems than the former. The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead, the recipient is free to read the message at a later time. For this reason, literature distribution may present even fewer crowd control problems than the oral proselytizing that the State already allows upon the fairgrounds. In contrast, ... sales and the collection of solicited funds not only require the fairgoer to stop, but also `engender additional confusion ... because they involve acts of exchanging articles for money, fumbling for and dropping money, making change, etc'" (Id., at p. 665, 101 S.Ct. 2559 (cone. & dis. opn. of Blackmun, J.).)
The court next addressed the contentneutrality issue in Kokinda, supra, 497 U.S. 720, 110 S.Ct. 3115. There, four members of the court concluded that the place at which solicitation was barred, a *12 walkway on postal department property leading from a parking lot to a post office, was not a public forum, and hence the solicitation ban could be upheld so long as it was reasonable and not an effort to discriminate on the basis of viewpoint. (Id., at pp. 726-730, 110 S.Ct. 3115.) Nevertheless, the plurality addressed the issue of content neutrality, twice stating that the solicitation ban was content neutral. The plurality first observed that solicitation is "unquestionably a particular form of speech that is disruptive of business. Solicitation impedes the normal flow of traffic. See Heffron, supra, [452 U.S. at page] 653 [, 101 S.Ct. 2559]. Solicitation requires action by those who would respond: The individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card." (Kokinda, supra, 497 U.S. 720, 733-734, 110 S.Ct. 3115.) Thereafter the Kokinda plurality stated: "It is the inherent nature of solicitation itself, a content-neutral ground, that the [Postal] Service justifiably relies upon when it concludes that solicitation is disruptive of its business.... [¶] Clearly, the regulation does not discriminate on the basis of content or viewpoint'" (Id., at p. 736, 110 S.Ct. 3115, italics added.)
Justice Kennedy, providing the fifth vote for the judgment in Kokinda, concurred separately to state his view that although he found the walkway to be a public forum under a "basic incompatibility" forum analysis, he nevertheless concluded that the challenged restriction was proper because it was content neutral and a permissible time, place, and manner regulation. (Kokinda, supra, 497 U.S. 720, 737, 110 S.Ct. 3115 (cone. opn. of Kennedy, J.).) In reaching that conclusion, Justice Kennedy stressed the narrow purpose and scope of the regulation, observing that it "expressly permits the respondents and all others to engage in political speech on topics of their choice and to distribute literature soliciting support, including money contributions, provided there is no in-person solicitation for payments on the premises.... [¶] Just as the government has a significant interest in preventing Visual blight' in its cities, [citation], in `maintaining [public] parks ... in an attractive and intact condition,' [citation], and in `avoiding congestion and maintaining the orderly movement' of persons using a public forum, [citation], so the Government here has a significant interest in protecting the integrity of the purposes to which it has dedicated the property, that is, facilitating its customers' postal transactions. Given the Postal Service's past experience with expressive activity on its property, I cannot reject its judgment that in-person solicitation deserves different treatment from alternative forms of solicitation and expression. [Citation.] The same judgment has been made for the classic public forums in our Nation's capital. The solicitation of money is banned in the District of Columbia on the Mall and other parks under the control of the National Park Service. [Citation.] [f ] The Postal Service regulation, narrow in its purpose, design, and effect, does not discriminate on the basis of content or viewpoint, is narrowly drawn to serve an important governmental interest, and permits respondents to engage in a broad range of activity to express their views, including the solicitation of financial support." (Id., at pp. 738-739, 110 S.Ct. 3115, italics added.)
Three justices joined Justice Brennan in dissent, taking issue with (i) the plurality's public forum analysis and conclusion (Kokinda, supra, 497 U.S. 720, 740-752, 110 S.Ct. 3115 (dis. opn. of Brennan, J.)) and (ii) the majority's characterization of the solicitation regulation as being content neutral (id., at pp. 752-755, 110 S.Ct. 3115). On the latter point, the dissent advanced the same literal reading of the phrase "content neutral" here asserted by plaintiffs. The dissenters argued that "[t]he regulation is not content neutral ... [because] it is tied explicitly to the content *13 of speech. If a person on postal premises says to members of the public, `Please support my political advocacy group,' he cannot be punished. If he says, `Please contribute $10,' he is subject to criminal prosecution. His punishment depends entirely on what he says." (Id., at p. 753, 110 S.Ct. 3115.)
The question whether a law regulating solicitation is content based or content neutral arose again in Lee, supra, 505 U.S. 672, 112 S.Ct. 2701. There, a majority of the court held that the terminals of New York City's three international airports were neither traditional nor designated public forums, thus finding it unnecessary to address whether the challenged regulations (bans on, among other things, solicitation for the immediate payment of money) were content based. The point was addressed, however, in Justice Kennedy's concurring opinion, because he concluded as he had done in Kokinda, that under a basic incompatibility analysis, the forums were indeed public ones. On the question of content neutrality, Justice Kennedy observed: "If the ... solicitation regulation prohibited all speech that requested the contribution of funds, I would conclude that it was a direct, content-based restriction of speech in clear violation of the First Amendment. The ... regulation does not prohibit all solicitation, however; it prohibits the `solicitation and receipt of funds.' I do not understand this regulation to prohibit all speech that solicits funds. It reaches only personal solicitations for immediate payment of money.... The regulation does not cover, for example, the distribution of preaddressed envelopes along with a plea to contribute money to the distributor or his organization. As I understand the restriction it is directed only at the physical exchange of money, which is an element of conduct interwoven with otherwise expressive solicitation. In other words, the regulation permits expression that solicits funds, but limits the manner of that expression to forms other than the immediate receipt of money." (Lee, supra, 505 U.S. 672, 704-705, 112 S.Ct. 2701 (cone. opn. of Kennedy, J.), italics added.)
Justice Kennedy continued: "So viewed, I believe the ... rule survives our test for speech restrictions in the public forum. In-person solicitation of funds, when combined with immediate receipt of that money, creates a risk of fraud and duress that is well recognized, and that is different in kind from other forms of expression or conduct.... I would add that our precedents, as well as the actions of coordinate branches of Government, support this conclusion. We have in the past recognized that in-person solicitation has been associated with coercive or fraudulent conduct. Cantwell v. Connecticut, 310 U.S. 296, 306, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Riley, supra, [487 U.S.] at 800 [108 S.Ct. 2667]; Heffron [, supra], 452 U.S. 640, 657 [101 S.Ct. 2559] ... (Brennan, J., concurring in part and dissenting in part); Schaumburg, supra, 444 U.S., at 636-638 [100 S.Ct. 826]. In addition, the Federal Government has adopted regulations which acknowledge and respond to the serious problems associated with solicitation. The National Park Service has enacted a flat ban on the direct solicitation of money in the parks of the Nation's capital within its control. [Citations.] Also, the Federal Aviation Administration, in its administration of the airports of Washington, D.C., even while permitting the solicitation of funds has adopted special rules to prevent coercive, harassing, or repetitious behavior. [Citation.] And in the commercial sphere, the Federal Trade Commission has long held that `it constitutes an unfair and deceptive act or practice' to make a door-to-door sale without allowing the buyer a 3-day `cooling-off period' during which time he or she may cancel the sale. [Citation.] All of these measures are based on a recognition that requests for immediate payment of money create a strong potential for fraud or undue pressure, in part because of the lack of time for reflection. *14 As the Court recounts, questionable practices associated with solicitation can include the targeting of vulnerable and easily coerced persons, misrepresentation of the solicitor's cause, and outright theft.... [¶] Because the ... solicitation ban is directed at these abusive practices and not at any particular message, idea, or form of speech, the regulation is a content-neutral rule serving a significant government interest. We have held that the content neutrality of a rule must be assessed based on whether it is `"justified without reference to the content of the regulated speech."' Ward, [supra,] 491 U.S., at 791 [109 S.Ct. 2746].... It is apparent that the justification for the solicitation ban is unrelated to the content of speech or the identity of the speaker." (Lee, supra, 505 U.S. 672, 705-706, 112 S.Ct. 2701, italics omitted (cone. opn. of Kennedy, J.).)
The dissent in Lee, supra, 505 U.S. 672, 709, 112 S.Ct. 2701 (dis. opn. of Souter, J., joined by Blackmun & Stevens, JJ.), did not contest the conclusion that the solicitation ban was content neutral, but instead merely assumed arguendo that it was (id., at p. 712, 112 S.Ct. 2701), and challenged the majority's public forum analysis (id, at pp. 709-711, 112 S.Ct. 2701) and its conclusion that the regulations satisfied the intermediate scrutiny of time, place, and manner analysis (id., at pp. 712-715, 112 S.Ct. 2701).
Viewed together, these high court opinions establish that a restriction on solicitation for immediate donation or exchange of funds may be found to be content neutral for purposes of the First Amendment even if the measure regulates such solicitation while leaving other types of speech untouched, so long as the regulation predominantly is addressed to the inherently intrusive and potentially coercive nature of that kind of speech, and not to the content of the speech. (See Doucette, supra, 955 F.Supp. 1192,1204, citing Kokinda, supra, 497 U.S. at p. 736, 110 S.Ct. 3115.) Moreover, as observed in Doucette, the high court has found such regulations to be content neutral "even though it could be argued that solicitation is more disruptive only because of its content and the attendant reactions that such content provokes. See Kokinda, [supra, 497 U.S. at page] 754 [110 S.Ct. 3115] (Brennan, J., dissenting)." (Doucette, supra, 955 F.Supp. at p. 1204.)[14] The competing literal approach to determining content neutrality appears to be at odds with the high court's general desire for narrow tailoring in this area, and seems inconsistent with that court's oft-repeated statements that content neutrality turns on whether the regulation is "justified" by legitimate concerns that are unrelated to any "disagreement with the message" conveyed by the speech (Ward, supra, 491 U.S. 781, 791, 109 S.Ct. 2746) and that such a regulation will be found content neutral "even if it has an incidental effect on some speakers or messages but not others." (Ibid.)
All lower court decisions of which we are aware, applying the First Amendment in this context, similarly have held (in reliance upon the opinions in Heffron, Kokinda, and Lee) that laws targeting solicitations but not other speech are nevertheless content neutral. (Xiloj-Itzep, supra, 24 Cal.App.4th 620, 636-638, 29 Cal.Rptr.2d 879; ISKCON of Potomac, Inc. v. Kennedy (D.C.Cir.1995) 61 F.3d 949, 954-955; ACORN v. City of Phoenix (9th Cir.1986) 798 F.2d 1260, 1267-1271; Doucette, supra, 955 F.Supp. 1192, 1204; see also Smith v. City of Fort Lauderdale, Fla. (11th Cir.1999) 177 F.3d 954, 956 [plaintiffs conceded that solicitation ordinance was content neutral].)[15] It is apparent that *15 under the First Amendment the type of solicitation regulation at issue in the case before us is to be viewed as content neutral (and hence should be subject to intermediate, rather than strict scrutiny) so long as the regulation is justified without reference to the content of the regulated speech and is viewpoint neutral.

2.
Alternatives, supra, 145 Cal.App.3d 436, 193 Cal.Rptr. 384, comes to a different conclusion, relying almost exclusively upon a literal interpretation of the phrase "content neutral." In Alternatives, the court invalidated an ordinance that banned door-to-door charitable solicitation after sundown. The court found the ordinance to embody a "`content-based discrimination between ... categories of speech' in that it `distinguishes between speech merely conveying information on the one hand and speech conveying information in conjunction with a request for funds or contributions on the other.'" (Id., at p. 450, 193 Cal.Rptr. 384.) The court's analysis in Alternatives was based exclusively upon three high court First Amendment cases, none of which involved solicitation. (Ibid.) In a footnote, however, the court in Alternatives stated that its analysis applied to the "free speech provisions of the United States and California Constitutions alike." (Id., at p. 448, fn. 7, 193 Cal.Rptr. 384.) For this reason, Alternatives has been construed as being independently grounded on article I, section 2(a), of the California Constitution, as well as on the First Amendment. (Carreras, supra, 768 F.2d 1039, 1048; ISKCon, supra, 966 F.Supp. 956, 969; Berkeley Community, supra, 902 F.Supp. 1084, 1090-1091; Church of the Soldiers, supra, 886 F.Supp. 721, 725; see also City of Fresno, supra, 31 Cal.App.4th 32, 36, 36 Cal.Rptr.2d 456.)
It may be questioned whether Alternatives, supra, 145 Cal.App.3d 436, 193 Cal. Rptr. 384, represented a correct interpretation of the First Amendment at the time that decision was issued. Heffron, supra, 452 U.S. 640, 101 S.Ct. 2559, in which the high court found a solicitation restriction to be content neutral, was decided two years before Alternatives but was not cited or discussed therein. Moreover, it seems clear that Alternatives does not accurately reflect the state of First Amendment law today.
In any event, as we shall explain, we believe that the court's conclusion in Alternatives with respect to the liberty of speech clause of the California Constitution was erroneous for two fundamental reasons.

a.
First, Alternatives, supra, 145 Cal. App.3d 436, 193 Cal.Rptr. 384, failed to take into account the considerable body of California decisions that have evaluated solicitation regulations. As explained below, those cases do not suggest that a regulation that singles out solicitation is constitutionally suspect.
In Matter of Application of Dart (1916) 172 Cal. 47, 155 P. 63 (Dart), this court invalidated municipal ordinances that gave a local licensing commission absolute and standardless power to deny the right to solicit on behalf of a private charity. At the same time, however, the court clearly explained that the activity of soliciting funds may be regulated by a properly written ordinance: "The occupation of soliciting contributions to charitable purposes is clearly so far subject to the police power, that it may be regulated by laws or ordinances providing for a reasonable supervision over the persons engaged therein, and for the application and use of the contributions received to the purposes intended, *16 in order to prevent unscrupulous persons from obtaining money, or other things, under the pretense that they were to be applied to charity, and to prevent the wrongful diversion of such funds to other uses, or to secure them against waste. Measures reasonably tending to secure these ends are unquestionably valid." (Id., at p. 56, 155 P. 63 (cone. opn. of Shaw, J., speaking for maj. of court).)
We quoted with approval this passage of Dart, in Gospel Army v. City of Los Angeles (1945) 27 Cal.2d 232, 163 P.2d 704 (Gospel Army), a case in which we upheld, under the federal and state Constitutions, a local ordinance regulating charitable solicitors. In Gospel Army, we contrasted the regulation at issue in that case with a legislative measure regulating persons who solicit union membership that had been invalidated in Thomas v. Collins (1945) 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430, noting that the court in Thomas "was careful ... to distinguish cases in which the speaker solicits funds from the public: `Once the speaker goes further, however, and engages in conduct which amounts to more than the right of free discussion comprehends, as when he undertakes the collection of funds or securing subscriptions, he enters a realm where a reasonable registration or identification requirement may be imposed..... [This would constitute ] free speech plus conduct akin to the activities [that ] ... the State might regulate .... ` In his concurring opinion in Thomas v. Collins Mr. Justice Jackson gives the following reasons for these variations in state power: `This wider range of power over pursuit of a calling than over speech-making is due to the different effects which the two have on interests which the state is empowered to protect. The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency (Gospel Army, supra, 27 Cal.2d at p. 247, 163 P.2d 704, italics added.) In these passages, Gospel Army makes clear that a legislative body does not act in a constitutionally suspect manner in singling out the solicitation of funds for distinct treatment. (Accord, Rescue Army v. Municipal Court (1946) 28 Cal.2d 460, 467, 171 P.2d 8 et seq.)
More recently, and to the same effect, in Fogelson, supra, 21 Cal.3d 158, 145 Cal. Rptr. 542, 577 P.2d 677, we held unconstitutional under the federal and state charters an ordinance requiring a permit to solicit on city property. Although we found the legislation at issue in that case unconstitutional for failing to provide licensing officials with sufficiently definite and objective guidelines for issuing licenses (id., at pp. 166-167, 145 Cal.Rptr. 542, 577 P.2d 677), we stressed that "[t]he mere fact that the challenged ordinance attempts to regulate constitutionally protected speech ... does not, of course, render it unconstitutional.... The state may, for example, reasonably regulate the time, place and manner of engaging in solicitation in public places. [Citations.] The state may also reasonably and narrowly regulate solicitations in order to prevent fraud (see, e.g., Gospel Army [, supra,] 27 Cal.2d 232, 163 P.2d 704) or to prevent undue harassment of passersby or interference with the business operations being conducted on the property (see, e.g., In re Hoffman (1967) 67 Cal.2d 845, 851-852, 64 Cal.Rptr. 97, 434 P.2d 353)." (Fogelson, supra, 21 Cal.3d at pp. 165-166, 145 Cal. Rptr. 542, 577 P.2d 677, italics added.) Consistent with this view, Justice Mosk observed in his concurring opinion in Fogelson that "while the instant municipal ordinance falters because of constitutional infirmity, it is not impossible for the city to reasonably regulate the public conduct of mendicants" and that "[n]othing in the court's opinion should deter the city from appropriately legislating if the public welfare so dictates." (Id., at pp. 168-169, 145 *17 Cal.Rptr. 542, 577 P.2d 677 (cone. opn. of Mosk, J.).) Fogelson thus makes it clear that legislation imposing distinct requirements on solicitations is not constitutionally suspect.
As the foregoing decisions demonstrate, this court has not suggested that legislative measures directed at public solicitation of funds are constitutionally suspect merely because they do not impose the same requirements on other forms of free expression, nor have we suggested that an ordinance directed at public solicitation of funds is a content-based regulation that must be specially justified under the strict scrutiny standard.

b.
Second, the court's literal approach in Alternatives to the content-based doctrine also ignores the theoretical underpinnings of that doctrine and the reasons content-based distinctions are constitutionally suspect. The cases of Danskin v. San Diego Unified Sch. Dist. (1946) 28 Cal.2d 536, 171 P.2d 885 (Danskin), in which we invalidated under the federal and state charters a statute that permitted the use of public school meeting places by all persons or groups except those that were found to be subversive elements, and Wirta v. Alameda-Contra Costa Transit Dist. (1967) 68 Cal.2d 51, 64 Cal.Rptr. 430, 434 P.2d 982 (Wirta), in which we invalidated a municipal transportation district regulation that permitted commercial advertising but barred political or other noncommercial messages on its buses, demonstrate that the kind of content-based distinctions that are suspect are those that involve government censorship of subject matter or governmental favoritism among different viewpoints.
In Danskin, supra, 28 Cal.2d 536, 171 P.2d 885, the court stated: "It is true that the state need not open the doors of a school building as a forum and may at any time choose to close them. Once it opens its doors, however, it cannot demand tickets of admission in the form of convictions and affiliations that it deems acceptable.... [¶] The very purpose of a forum is the interchange of ideas, and that purpose cannot be frustrated by a censorship that would label certain convictions and affiliations suspect, denying the privilege of assembly to those who hold them, but granting it to those whose convictions and affiliations happen to be acceptable and in effect amplifying their privilege by making it a special one.... It is not for the state to control the influence of a public forum by censoring the ideas, the proponents, or the audience; if it could, that freedom which is the life of a democratic assembly would be stilled." (Id., at pp. 547-548, 171 P.2d 885.) Likewise, in Wirta, supra, 68 Cal.2d 51, 64 Cal.Rptr. 430, 434 P.2d 982, the court repeated with approval the above quoted language from Danskin, and observed that "[t]he prohibition here is painted with a much broader brush than that ... condemned in Danskin. There all opinions and beliefs which fell within the protection of the First Amendment could be aired in [public] schools, and only their expression by purportedly subversive elements was barred, ... here the ban is directly related to the content of the ideas sought to be published.... The vice is not that the district has preferred one point of view over another, but that it chooses between classes of ideas entitled to constitutional protection, sanctioning the expression of only those selected, and banning all others. Thus the district's regulation exercises a most pervasive form of censorship." (Id., at p. 56, 64 Cal.Rptr. 430, 434 P.2d 982.)[16]
*18 The decision in Alternatives failed to recognize that such concerns about government censorship are not raised by a regulation that, responding to the problems and hazards created by the request for an immediate contribution or transfer of money, applies to all solicitation of funds, regardless of the subject matter or viewpoint for which funds are solicited.
Alternatives's literal approach to determining content neutrality is suspect in another sense. It has been observed that "the goals of content neutrality and narrow tailoring are inherently in tension." (Ellickson, Controlling Chronic Misconduct in City Spaces: Of Panhandlers, Skid Rows, and Public-Space Zoning (1996) 105 Yale.L.J. 1165, 1232, fn. 370; see also id., at p. 1236.) Plaintiffs' proposed approach highlights and exacerbates that tension.
As noted above, the regulation of solicitation long has been recognized as being within the government's police power (Dart, supra, 172 Cal. 47, 56, 155 P. 63 (cone. opn. of Shaw, J., for maj. of court); Gospel Army, supra, 27 Cal.2d 232, 246, 163 P.2d 704; Eye Dog Foundation v. State Board of Guide Dogs for the Blind (1967) 67 Cal.2d 536, 549-550, 63 Cal.Rptr. 21, 432 P.2d 717; Fogelson, supra, 21 Cal.3d 158, 165-166, 145 Cal.Rptr. 542, 577 P.2d 677 (maj.opn.); id., at pp. 168-169, 145 Cal.Rptr. 542, 577 P.2d 677 (cone. opn. of Mosk, J.), and yet plaintiffs' suggested approach to content neutrality in many instances would frustrate or preclude the kind of narrow tailoring that generally is demanded with regard to the exercise of such police-power regulation in the area of protected expression. If, as plaintiffs suggest, lawmakers cannot distinguish properly between solicitation for immediate exchange of money and all other kinds of speech, then it may be impossible to tailor legislation in this area in a manner that avoids rendering that legislation impermissibly overinclusive. In our view, a court should avoid a constitutional interpretation that so severely would constrain the legitimate exercise of government authority in an area in which such regulation long has been acknowledged as appropriate.

D.
We conclude that in light of the history of solicitation regulations in California and the theoretical foundations of the content based doctrine, regulations such as the Los Angeles ordinance here at issue, that single out the public solicitation of funds for distinct treatment, should not be viewed as content based or constitutionally suspect for purposes of analysis under article I, section 2(a), of the California Constitution. We have not been cited, nor have we found, anything in the history of the article (e.g., Browne, supra, Report of the Debates (1850); Willis & Stockton, supra, Debates and Proceedings (1878-1879); Cal. Const. Revision Com., Proposed Revision, supra), or in the cases construing it, that is inconsistent with the foregoing conclusion.

V.
In response to the Ninth Circuit's certification request, we conclude as follows: Regulations such as the Los Angeles ordinance here at issue, banning all aggressive solicitation for the immediate exchange of funds, and banning all solicitation for immediate *19 donations in certain captive audience areas, should be considered content neutral for purposes of article I, section 2(a).
BAXTER, J., WERDEGAR, J., CHIN, J., and BROWN, J., concur.
Concurring Opinion by WERDEGAR, J.
I have signed the majority opinion. I write separately only to make clear that the opinion does not decide any question about the constitutionality of rule 29.5 of the California Rules of Court. The rule reflects the assumption that the California Constitution gives this court jurisdiction to answer certified questions. As the majority notes, some other states' supreme courts have found themselves to possess similar powers under their own state constitutions. (Maj. opn., ante, 93 Cal.Rptr.2d at p. 6, 993 P.2d at p. 338.) We do not today address the scope and limits of the provisions defining our own powers (Cal. Const., art. VI, §§ 10, 11, 12) because, as the majority also notes, the parties have not questioned rule 29.5's validity.
Dissenting Opinion by MOSK, J.
I dissent.
The provisions at issue, antisolicitation regulations under City of Los Angeles Ordinance No. 171664 (the ordinance), target a broad range of conduct and speech found by the Council of the City of Los Angeles to be "extremely disturbing and disruptive to residents and businesses." (L.A. Ord. No. 171664 (preamble).) Although the ordinance is entitled a "Prohibition Against Certain Forms of Aggressive Solicitation," only a portion of its provisions actually involves "aggressive" conduct; the other provisions restrict or ban a wide variety of expressive activities, no matter how peaceful or passive, including charitable or political solicitation and the sale of newspapers, books, pamphlets, and other items in specified locations (including the area around public transportation stops, public parking lots, and outdoor areas where food is served) on public streets, plazas, and in other public fora.
The majority conclude that the ordinance passes constitutional muster under California's liberty of speech clause (Cal. Const., art. I, § 2) because it is justified by a content-neutral purpose, i.e. that solicitation, as a category of expression, is inherently more hazardous than other types of speech. According to the majority, the ordinance is not "constitutionally suspect" because it merely imposes time, place, and manner restrictions on protected expression without regard to content. (Maj. opn., ante, 93 Cal.Rptr.2d at pp. 2, 18, 993 P.2d at pp. 335, 349.)
I disagree. The ordinance does not restrict only the time, place, and manner of expression. It restricts solicitation precisely because of its content: the identical time, place, and manner of expression are or are not proscribed depending only on what words (or gestures) are used. Plaintiffs offer the following example. A person holding a sign that states "Fight Hunger In Our Community" may freely stand on a public street near a taxi stop in Los Angeles, even if people ask him to leave. Another person holding a sign stating "Fight Hunger In Our Community; Please Donate To Our Church Soup Kitchen" standing in exactly the same place is potentially acting illegally under the ordinance. Both speakers are expressing themselves at the same time and place and in the same manner; the only difference is the content of their speech. The ordinance may be viewpoint neutral because it treats all solicitation the same way; but it is not content neutral because it discriminates between requests for money and offers of goods or services and other speech. It must therefore be reviewed under a strict scrutiny standard. (U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Laboratory (1984) 154 Cal.App.3d 1157, 1170, 201 Cal.Rptr. 837.)
In my view, the City of Los Angeles cannot justify a categorical prohibition *20 against all solicitation  broadly defined to include speech, the printed word, bodily gestures, signs or other means of requesting an immediate donation or selling goods or services  on the basis that it is inherently disruptive. "Broad prophylactic rules in the area of free expression are suspect." (N.A.A.C.P. v. Button (1963) 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405.) Indeed, the United States Supreme Court cases on which the majority rely are far more limited in scope than the majority suggest. None purported to restrict requests for voluntary donations or the sale of goods or services at locations historically associated with the exercise of First Amendment rights, including the streets, sidewalks, plazas, transportation facilities and other public places in a major metropolis.
Thus, Heffron v. Int'l Soc. for Krishna Consc. (1981) 452 U.S. 640, 655, 101 S.Ct. 2559, 69 L.Ed.2d 298, involved a rule restricting the sale, exhibit, or distribution of any merchandise, including printed or written material to fixed locations at an annual state fair, a "limited public forum." The rule addressed conduct  i.e., the manner, not the content, of expression  on the basis that it would interfere with the flow of traffic at the crowded event; without the rule "there would be widespread disorder at the fairgrounds." (Id. at p. 653, 101 S.Ct. 2559.) The other cases cited by the majority involved restrictions on solicitation in nonpublic fora; in such locations, there is no requirement of content neutrality. (United States v. Kokinda (1990) 497 U.S. 720, 728, 110 S.Ct. 3115, 111 L.Ed.2d 571; International Soc. for Krishna Consciousness, Inc. v. Lee (1992) 505 U.S. 672, 679, 112 S.Ct. 2701, 120 L.Ed.2d 541.) The majority rely for the most part on dictum derived from a plurality opinion in Kokinda and the concurring opinion of a single justice in Lee. (See maj. opn., ante, 93 Cal.Rptr.2d at pp. 11-14, 993 P.2d at pp. 343-346.) I disagree that the limited and divided holdings in these cases "establish" that a restriction on solicitation is content neutral for purposes of the First Amendment so long as the regulation is addressed to the "inherently intrusive and potentially coercive nature of that kind of speech." (Maj. opn., ante, at p. 14, 993 P.2d at p. 346.)
But, in any event, we are interpreting a constitutional provision "`more definitive and inclusive than the First Amendment'": the liberty of speech clause of article I, section 2 of the California Constitution. (Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501, 519, 217 Cal.Rptr. 225, 703 P.2d 1119.) Our past decisions have broadly proclaimed the independence of the California Constitution and, in particular, the strength of liberty of speech in this state, which guarantees the right of "[e]very person" to "freely speak, write and publish his or her sentiments on all subjects." (Cal. Const., art. I, § 2, subd. (a), italics added; see, e.g., Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908, 153 Cal.Rptr. 854, 592 P.2d 341; Dailey v. Superior Court (1896) 112 Cal. 94, 97, 44 P. 458.)
The majority point to "this court's decisions dating back more than 80 years" for the proposition that requests for the immediate donation of money create distinct problems and risks warranting regulation. (Maj. opn., ante, 93 Cal.Rptr.2d at p. 2, 993 P.2d at p. 335.) The cases involved ordinances requiring junk dealers and solicitors of funds for organized charities to obtain permits, with the aim of preventing the use of fraudulent practices by those collecting funds or property for charitable purposes. (Rescue Army v. Municipal Court (1946) 28 Cal.2d 460, 171 P.2d 8; Gospel Army v. City of Los Angeles (1945) 27 Cal.2d 232, 163 P.2d 704; Matter of Application of Dart (1916) 172 Cal. 47, 155 P. 63.) Unlike the ordinance under review, the licensing provisions at issue in those cases did not purport to apply time, place, or manner restrictions to charitable solicitation, let alone sweep an entire category of expression off a public forum. Nor, unlike the ordinance under review, *21 did they impose punishment depending only on what was said. Indeed, contrary to the majority's implication, these early cases did not involve any challenge at all based on the First Amendment or the liberty of speech clause of article 1, section 2 of the California Constitution. (Gospel Army v. City of Los Angeles, supra, 27 Cal.2d at p. 248, 163 P.2d 704 [ordinance did not deny religious liberty under Cal. Const. art. 1, § 21]; Rescue Army v. Municipal Court, supra, 28 Cal.2d at p. 470-472, 171 P.2d 8 [accord]; Matter of Application of Dart, supra, 172 Cal. 47, 56, 155 P. 63 [permit requirements invalid as violating the right of free exercise of religion].) Accordingly, they shed no light on the question whether the ordinance at issue here is content neutral; not surprisingly, none of the cases was cited by the parties herein.[1]
Certainly, the City of Los Angeles may penalize disorderly, harassing, and intimidating conduct in a public space, such as obstructing the area in front of an automated teller machine or threatening personal harm. As I stated in my concurring opinion in People v. Fogelson (1978) 21 Cal.3d 158, 145 Cal.Rptr. 542, 577 P.2d 677, government may reasonably regulate "the public conduct of medicants, including those who purport to be motivated by religious fervor ... if the public welfare so dictates." (Id. at pp. 168-169, 145 Cal. Rptr. 542, 577 P.2d 677 (cone. opn. of Mosk, J.), italics added.) The Legislature has done so. (See, e.g., Pen.Code, § 647c [misdemeanor to willfully and maliciously obstruct the free movement of any person on any street, sidewalk, or other public place]; id., § 532d [misdemeanor to make false representations in solicitation of charitable contributions]; id., § 415, subd. (3) [imposing punishment for "[a]ny person who uses offensive words in a public place which are inherently likely to provoke an immediate violent reaction"].)
But I am unpersuaded that all the many kinds of peaceful expression restricted or even banned altogether under the ordinance can be regulated based on the generalization that they inherently cause "problems and hazards." (Maj. opn., ante, 93 Cal.Rptr.2d at p. 17, 993 P.2d at p. 348.) I doubt that a Salvation Army bellringer or a newspaper hawker generally presents a danger to the public, or that solicitation by a Girl Scout selling cookies is inherently more likely to be disruptive than other types of speech. Nor does the activist holding out a donation cup for a political cause or a homeless person carrying a sign asking for money for food constitute a threat to public health and safety. A person at a public transportation stop or public parking lot can refuse or ignore the request; a pedestrian can simply walk on. Even the more importunate forms of solicitation  panhandlers asking for "spare change" near automated teller machines or bus stops and unkempt persons offering car washing "services" on the public streets  do not invariably pose a safety hazard, although they may be annoying or embarrassing. "Annoyance and inconvenience, however, are a small price to pay *22 for preservation of our most cherished right." (Wirta v. Alameda-Contra Costa Transit Dist. (1967) 68 Cal.2d 51, 62, 64 Cal.Rptr. 430, 434 P.2d 982.)
As emphasized in Fogelson, "it is important to recognize that individuals in public places cannot expect the same degree of protection from contact with others as they are entitled to in their own homes. `"The man who goes ... to a public place must expect to meet and mingle with all classes of people. He cannot ask, to suit his caprice or prejudice or social views, that this or that man shall be excluded because he does not wish to associate with them."'" (People v. Fogelson, supra, 21 Cal.3d at p. 166, fn. 8, 145 Cal.Rptr. 542, 577 P.2d 677.)
For these reasons, I dissent.
Dissenting Opinion by KENNARD, J.
Free speech is often annoying. Just ask any parent.
But in the public forum at least, the people of our state and nation have chosen to accord free speech preeminent constitutional protection. This choice is founded on the belief that on the whole it is more dangerous to empower the government to select what we shall hear than it is to put up with the diversity and cacophony of uncensored and sometimes offensive speech. "`[U]nder our system of government we may not prohibit the dissemination of views simply because they are controversial, distasteful, or disturbing. To sanction such a prohibition "would be a complete repudiation of the philosophy of the Bill of Rights." [Citation.]' [Citation.]" (Aguilar v. Avis Rent A Car System, Inc. (1999) 21 Cal.4th 121, 177, 87 Cal.Rptr.2d 132, 980 P.2d 846 (dis. opn. of Kennard, J.).)
That principle is at issue here. To assist it in deciding a case pending before it, the United States Court of Appeals for the Ninth Circuit has certified this question to us: Under the liberty of speech clause of the California Constitution, does a city ordinance banning various forms of aggressive solicitation and banning solicitation, but not other speech, in certain locations selectively suppress speech on the basis of content?
The ordinance's aggressive solicitation ban, which addresses noncommunicative conduct and "fighting words" and other forms of speech unprotected by the California Constitution, prohibits aggressive conduct and offensive speech only when they occur in connection with solicitation and not when they occur in connection with speech conveying other messages. The aggressive solicitation ban thus is content based because it uses the content of the speaker's message to determine whether the speaker is subject to punishment.
The ordinance's location ban too suppresses speech on the basis of content. At the locations to which it applies, it prohibits speech whose message is a solicitationincluding begging, charitable donation solicitation, political donation solicitation, and offers to sell goods or servicesbut not speech on other topics.
The majority nevertheless concludes that the ordinance is content neutral, not content based. This decision is yet another example of the insensitivity to free speech that appears to be developing in this court. Barely six months ago, this court, over my dissent, approved an injunction censoring disfavored speech in the workplace. (Aguilar v. Avis Rent A Car System, Inc., supra, 21 Cal.4th 121, 176, 87 Cal.Rptr.2d 132, 980 P.2d 846 (dis. opn. of Kennard, J.).) Today, it approves an ordinance that censors disfavored speech in public places. But our right to free speech means little unless it also protects speech we find offensive or annoying. Accordingly, I dissent.

I
Regarding the First Amendment to the federal Constitution, the United States Supreme Court has said: "It is axiomatic that the government may not regulate *23 speech based on its substantive content or the message it conveys. [Citation.] Discrimination against speech because of its message is presumed to be unconstitutional." (Rosenberger v. Rector and Visitors of Univ. of Va. (1995) 515 U.S. 819, 828, 115 S.Ct. 2510,132 L.Ed.2d 700.)
The same is true under the liberty of speech clause of the California Constitution. Its promise that "[e]very person may freely speak, write and publish his or her sentiments on all subjects" (Cal. Const., art. I, § 2, subd. (a)) is, if anything, an even stronger guarantee against the government's selective suppression of disagreeable messages, as the majority here acknowledges.[1] (See, e.g., Griset v. Fair Political Practices Com. (1994) 8 Cal.4th 851, 866, fn. 5, 35 Cal.Rptr.2d 659, 884 P.2d 116, ["As a general matter, the liberty of speech clause in the California Constitution is more protective of speech than its federal counterpart."].)
Because protection against government censorship of messages is fundamental to freedom of speech, a critical inquiry under both the federal and California Constitutions in determining the legitimacy of a governmental restriction on speech is whether the restriction is based on the content of the speaker's messagein other words, whether the restriction is content neutral or content based. Content-neutral restrictions on the time, place, and manner of speech are permissible under the First Amendment to the federal Constitution and under California's liberty of speech clause so long as they advance a significant governmental interest, are narrowly tailored, and leave open adequate alternative channels of communication. (Ward v. Rock Against Racism (1989) 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661; Metromedia, Inc. v. City of San Diego (1980) 26 Cal.3d 848, 868, 164 Cal.Rptr. 510, 610 P.2d 407, revd. on other grounds (1981) 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800.)
Under the First Amendment, speech restrictions that are content based must meet a higher level of justification than restrictions that are content neutral. "Content-based regulations are presumptively invalid." (R.A.V. v. St. Paul (1992) 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305.) "`The government may not regulate [speech] based on hostilityor favoritismtowards the underlying message expressed.'" (Turner Broadcasting System, Inc. v. FCC (1994) 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497.) To pass muster under the First Amendment, a content-based speech restriction must serve a compelling governmental interest and must be narrowly tailored to advance that interest while infringing on as little speech as possible. (Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd. (1991) 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476; Perry Ed. Assn. v. Perry Local Educators' Assn. (1983) 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794; Aguilar v. Avis Rent A Car System, Inc., supra, 21 Cal.4th 121, 179, 87 Cal.Rptr.2d 132, 980 P.2d 846 (dis. opn. of Kennard, J.).) This is known as the strict scrutiny test.
It does not appear this court has decided whether under California's liberty of speech clause the strict scrutiny test or some other standard applies to determine the validity of a content-based speech regulation.[2]

*24 II
At issue here is an ordinance of the City of Los Angeles prohibiting aggressive solicitation anywhere and banning solicitation at certain designated locations. As I noted earlier, a threshold inquiry in deciding the constitutionality of the ordinance under California's liberty of speech clause is whether its restrictions are content neutral or content based, for the outcome of that inquiry determines whether the ordinance qualifies for analysis as a "time, place, and manner" restriction. The Ninth Circuit phrased its certified question to us this way: "Is an ordinance that seeks to regulate the time, place and manner of solicitation of money or other thing of value or the sale of goods or services content based under the Liberty of Speech Clause of the California Constitution? Cal. Const. art. I, § 2." Over my objection, this court reformulated the question this way: "What is the proper standard under article I, section 2(a) of the California Constitution for analyzing the constitutionality of ordinances governing solicitations, such as Los Angeles Ordinance No. 171664?" (Maj. opn., ante, 93 Cal.Rptr.2d at pp. 4-5, 993 P.2d at pp. 337-338.)
The majority never answers its reformulated question. Although the majority sets forth the standard under the federal Constitution for analyzing the constitutionality of speech restrictions, it never articulates the corresponding standard under the California Constitution. Instead, the majority addresses the Ninth Circuit's original question and concludes simply that "regulations such as the Los Angeles ordinance here at issue, that single out the public solicitation of funds for distinct treatment, should not be viewed as content based or constitutionally suspect" under the liberty of speech clause. (Maj. opn., ante, 93 Cal. Rptr.2d at pp. 5, fn. 2, 18, 993 P.2d at pp. 337, fn. 2, 349.) Like the majority, I address the Ninth Circuit's original question to us: whether the ordinance here is content neutral. Unlike the majority, I also explain what, in my view, the proper standard is for deciding under the California Constitution whether a speech restriction is content neutral or content based.
The United States Supreme Court has faced a similar task in deciding whether speech restrictions are content neutral under the First Amendment to the federal Constitution. An examination of its relevant cases reveals the following principles. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." (Turner Broadcasting System, Inc. v. FCC, supra, 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497.) That is, a restriction is not content neutral if its applicability turns on the speaker's message. (Ibid.; R.A.V. v. St. Paul, supra, 505 U.S. 377, 391, 112 S.Ct. 2538, 120 L.Ed.2d 305; Burson v. Freeman (1992) 504 U.S. 191, 197, 112 S.Ct. 1846, 119 L.Ed.2d 5.)
A speech regulation may be content based even if the government's purpose in adopting the regulation is not to censor speech on the basis of content: "[W]hile a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases." (Turner Broadcasting System, Inc. v. FCC, supra, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497.) What matters is whether the operation of the restriction is structured so that the instances of speech to which the restriction applies are determined by examining the content of the speaker's message.
The high court's decision in Cincinnati v. Discovery Network, Inc. (1993) 507 U.S. 410, 428-430, 113 S.Ct. 1505, 123 L.Ed.2d 99, illustrates this principle. In Cincinnati v. Discovery Network, Inc., a city *25 banned all newsracks containing commercial solicitation handbills but permitted newsracks with newspapers to remain. The city's motive was to improve safety and esthetics by reducing the number of newsracks in the city, a content-neutral and noncensorious motive. (Id. at p. 429, 113 S.Ct. 1505.) Although that neutral motive might have justified a limit on the total number of all newsracks imposed without regard to the contents of the publications within the newsracks, it did not justify a selective ban of only those newsracks containing commercial solicitation handbills. (Id. at pp. 429-430, 113 S.Ct. 1505; accord, Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., supra, 502 U.S. 105, 117, 112 S.Ct. 501, 116 L.Ed.2d 476 ["`[i]llicit legislative intent is not the sine qua non of a violation of the First Amendment'"].) Thus, the selective newsrack ban, although motivated by a neutral purpose, was content based because it depended on the content of the publication within the newsrack. (Cincinnati v. Discovery Network, Inc., supra, 507 U.S. at p. 429, 113 S.Ct. 1505.)
"By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." (Turner Broadcasting System, Inc. v. FCC, supra, 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497.) Speech restrictions are content neutral under the First Amendment if they are "`justified without reference to the content of the regulated speech.'" (R.A.V. v. St. Paul, supra, 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305.) Typically, content-neutral regulations seek to remedy harms unrelated to the message of the speech they restrict in a manner that does not single out certain messages for disfavored treatment. For example, a restriction on amplified sound in a park is content neutral, even if the restriction will fall more heavily on rock music performances than on opera performances. (Ward v. Rock Against Racism, supra, 491 U.S. 781, 788, 792-793, 109 S.Ct. 2746, 105 L.Ed.2d 661.) The restriction is aimed at controlling the volume, not the message, of the sounds being amplified.
But just as a neutral motive will not save a speech restriction that on its face discriminates on the basis of content, if the government's motive is to censor then even a speech restriction that is content neutral on its face will be analyzed as a content-based restriction. In the words of the high court: "Our cases have recognized that even a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys." (Turner Broadcasting System, Inc. v. FCC, supra, 512 U.S. 622, 645, 114 S.Ct. 2445, 129 L.Ed.2d 497.)
These decisions by the United States Supreme Court may be summarized as follows: A speech restriction is content based if by its terms it uses the message conveyed by a particular speech act as the criterion for determining whether the restriction applies to that speech act. A speech restriction is content neutral if the criterion triggering its application is not the message conveyed by the speech act but some other characteristic, such as the medium of communication. Finally, a content-neutral purpose will not save a speech restriction that on its face restricts speech on the basis of its message from being judged as a content-based restriction; nor will a restriction neutral on its face be judged as a content-neutral restriction if the government's actual purpose is to target certain messages and not others.
Although, as I have noted, California's liberty of speech clause is a broader protection of speech than is the First Amendment, there does not appear any compelling reason to adopt a different standard of content neutrality for the liberty of speech clause. Content neutrality is only one aspect of the "time, place, and manner" test of permissible speech regulation this court has borrowed from federal constitutional law. It would be anomalous for us to alter, without good reason, the definition of *26 content neutrality while retaining the rest of the test unchanged.
Furthermore, as the high court has noted, there are valid reasons for rejecting a more stringent test that would find any regulation to be content based if it had a more severe impact on speech on one topic than on speech on other topics. Time, place, and manner restrictions are permitted to the extent they are instances of the government attacking some nonspeech harm by a method whose application does not turn on the content of the restricted speech. The test of content neutrality set forth above restricts the government from attacking a nonspeech harm by using disfavored speech as a convenient proxy for the harm (e.g., by banning only Ku Klux Klan marches because they are thought more likely to produce violence than St. Patrick's Day parades). A stricter test, under which a facially neutral speech restriction would be judged as content based if in practice the restriction (like the park's restriction on amplified sounds at issue in Ward v. Rock Against Racism, supra, 491 U.S. 781, 792-793, 109 S.Ct. 2746, 105 L.Ed.2d 661) falls more heavily on some messages than on others, would cut too broadly. Almost every restriction will have some disproportionate effect on different categories of messages, and such a test would severely restrict the ability of the government to attack nonspeech harms by restrictions that do not distinguish on the basis of message. Other elements of the time, place, and manner test, such as the requirements that the restriction be narrowly tailored and that ample alternative avenues remain available to the speaker, help ensure that a facially neutral restriction is not used as a subterfuge to suppress a particular message. Additionally, even a facially neutral restriction is unconstitutional if the government's motive is the selective suppression of speech. (Turner Broadcasting System, Inc. v. FCC, supra, 512 U.S. 622, 645, 114 S.Ct. 2445, 129 L.Ed.2d 497.)

III
Turning to the city ordinance at issue here, I join the majority in the recognition that solicitation is protected speech under article I, section 2 of the California Constitution. (Maj. opn., ante, 93 Cal.Rptr.2d at pp. 7-8, 993 P.2d at pp. 339-341.) Solicitation is a communicative activity, for a person soliciting seeks to communicate a request for an immediate donation of money or an offer to sell goods or services. Nor is solicitation one of those few narrow categories of communicative activity, like fighting words or obscenity, so inherently harmful that it is unprotected speech and may be banned completely. (See generally R.A.V. v. St. Paul, supra, 505 U.S. 377, 382-386, 112 S.Ct. 2538, 120 L.Ed.2d 305; Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501, 513, 217 Cal.Rptr. 225, 703 P.2d 1119.) Instead, solicitation is a protected communicative activity, both under the First Amendment and under the more expansive scope of California's protection of everyone's right to "freely speak, write and publish his or her sentiments on all subjects" (Cal. Const., art. I, § 2). (See United States v. Kokinda (1990) 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (plur.opn.) ["Solicitation is a recognized form of speech protected by the First Amendment."]; Benefit v. City of Cambridge (1997) 424 Mass. 918, 923, 679 N.E.2d 184 ["peaceful begging constitutes communicative activity protected by the First Amendment"]; Loper v. New York City Police Dept. (2d Cir.1993) 999 F.2d 699, 704 [begging is communicative activity protected under the First Amendment]; see generally Spiritual Psychic Science Church v. City of Azusa, supra, 39 Cal.3d at p. 512, 217 Cal.Rptr. 225, 703 P.2d 1119 [art. I, § 2 "`reaches beyond protection of citizen participation in, and ultimate control over, governmental affairs and protects in addition the interest in free interchange of ideas and impressions for their own sake, for whatever benefit the individual may gain'"].)
*27 The ordinance here defines the terms "solicit, ask or beg" as including "using the spoken, written, or printed word, or bodily gestures, signs or other means with the purpose of obtaining an immediate donation of money or other thing of value or soliciting the sale of goods or services." (L.A.Ord. No. 171664, § 41.59, subd. (a)(1).) I shall hereafter refer to these activities as "solicitation."
The ordinance reaches not only begging but also charitable solicitation and the sale of publications. It bans solicitation conducted in an "aggressive manner." (L.A.Ord. No. 171664, § 41.59, subd. (a)(1).) Aggressive solicitation includes approaching, speaking to, or following a person in a manner intended to cause or reasonably likely to cause intimidation or fear of bodily harm, property damage, or property loss; intentionally touching a person or vehicle in the course of soliciting; intentionally blocking or interfering with the passage of a pedestrian or vehicle; using violent or threatening gestures before, during or after solicitation; persisting in closely following or approaching a person after being informed that the person does not want to be solicited or to donate; or before, during, or after solicitation using profane, offensive, or abusive language likely to provoke an immediate violent reaction. (L.A.Ord. No. 171664, § 41.59, subd. (b)(2)(A)-(F).)
The ordinance also bans all solicitation in these locations: within 15 feet of an automated teller machine (ATM) or the entrance to a bank or other financial institution; when directed at an occupied motor vehicle located in a public place; in a parking lot or structure after dark; in a public transportation vehicle or within 10 feet of any designated transportation vehicle stop; and in any outdoor or indoor dining area of a restaurant.[3] (L.A.Ord. No. 171664, § 41.59, subd. (c)(l)-(4).)
The City of Los Angeles seeks to justify the ordinance as a valid content-neutral restriction on the time, place, and manner of speech. As I noted earlier, such a restriction is permissible so long as it is content neutral, advances a significant governmental interest, is narrowly tailored, and leaves open adequate alternative channels of communication. The question that the Ninth Circuit has certified to us concerns the first of these requirements: whether the ordinance is content neutral.
I first address the ordinance's aggressive solicitation ban. It prohibits noncommunicative harmful conduct (touching, blocking passage, using threatening gestures, closely following a person); it also prohibits two categories of harmful speech (speech intended or reasonably likely to cause fear of harm or intimidation and "fighting words" likely to provoke immediate violence) unprotected under the state or federal Constitutions. (See R.A.V. v. St. Paul, supra, 505 U.S. 377, 382-386, 112 S.Ct. 2538, 120 L.Ed.2d 305.) Although the harmful conduct and speech prohibited by the aggressive solicitation ban are generally proscribable, what makes the ban problematic is that, with one exception, it does not ban these proscribable words and conduct across the board but only when they occur in connection with one category of speech: solicitation.[4] Even when conduct or speech may be prohibited entirely, if the government instead selectively prohibits the conduct or speech only when it *28 occurs in connection with certain messages, the prohibition is content based. (Id. at pp. 383-386, 112 S.Ct. 2538.) For instance, the government regulates on the basis of content if it bans the burning of crosses only in connection with certain messages (id. at p. 391, 112 S.Ct. 2538) or if it creates a speed limit applying only to cars with socialist bumperstickers. So too here the aggressive solicitation ban is content based because it prohibits the specified conduct and words only when they occur in connection with solicitation and not in connection with other messages.
Turning to the ordinance's location ban, it is content based because at specified locations it prohibits only speech asking for a donation or offering something for sale, and not speech on other subjects. Thus, a speaker can approach someone using an ATM and ask for the time, but cannot ask for a quarter. The speaker can ask the ATM user to sign a petition, but not to buy a booklet supporting the position taken by the petition.
The harm the location ban attacks is the distraction, discomfort, or uneasiness the solicitor's message causes in those who hear it, not some other harm unrelated to the fact that the content of the message is a solicitation. "Listeners' reaction to speech is not a content-neutral basis for regulation." (Forsyth County v. Nationalist Movement (1992) 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101.) That reaction is inherently dependent on the message the speech conveys. Although the government may regulate speech for its harmful "secondary effects" unrelated to the content of its message "`[t]he emotive impact of speech on its audience is not a "secondary effect."'" (R.A.V. v. St. Paul, supra, 505 U.S. 377, 394, 112 S.Ct. 2538, 120 L.Ed.2d 305; see also Aguilar v. Avis Rent A Car System, Inc., supra, 21 Cal.4th 121, 135, fn. 4, 87 Cal.Rptr.2d 132, 980 P.2d 846 (plur.opn.); id. at p. 147, fn. 1, 87 Cal.Rptr.2d 132, 980 P.2d 846 (cone. opn. of Werdegar, J.); id. at p. 179, 87 Cal. Rptr.2d 132, 980 P.2d 846 (dis. opn. of Kennard, J.) [speech restriction was "based on content because it prohibits speech for its communicative impactits potential to offend the person who hears it"]; Planned Parenthood Shasta-Diablo, Inc. v. Williams (1994) 7 Cal.4th 860, 890, 30 Cal.Rptr.2d 629, 873 P.2d 1224 (dis. opn. of Kennard, J.) ["restrictions on speech may not be based on how the message affects those who receive it"].) A restriction that "suppresses expression out of concern for its likely communicative impact" is content based. (United States v. Eichman (1990) 496 U.S. 310, 317, 110 S.Ct. 2404, 110 L.Ed.2d 287.)
Stated differently, the ordinance's location ban is content based because the question of whether a statement made in such a location falls under the ordinance's prohibition depends entirely on the meaning of the statement. Only by examining the meaning of what has been said can it be decided whether the speaker has violated the ordinance.
My conclusion that the location ban is content based finds support in the United States Supreme Court's decision in Burson v. Freeman, supra, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5. Burson involved a statute forbidding the solicitation of votes and the display or distribution of campaign material within 100 feet of polling places, but permitting other categories of speech within that zone. (Id. at pp. 193-194, 197, 112 S.Ct. 1846.) The high court unanimously concluded that the statute's location restriction was not content neutral. (Id. at pp. 197, 112 S.Ct. 1846 (plur.opn.); id. at pp. 211-214, 112 S.Ct. 1846 (cone, opn. of Kennedy, J.); id. at p. 216, 112 S.Ct. 1846 (cone. opn. of Scalia, J.); id. at p. 217, 112 S.Ct. 1846 (dis. opn. of Stevens, J., joined by O'Connor and Souter, JJ.).) In the words of the court: "The Tennessee restriction under consideration ... is not a facially content neutral time, place, or manner restriction. Whether individuals may exercise their free speech rights near polling places depends entirely on whether their speech is related to a *29 political campaign. The statute does not reach other categories of speech, such as commercial solicitation, distribution, and display." (Id. at p. 197, 112 S.Ct. 1846.) As in Burson, the location ban in this case is not content neutral because it bans at certain locations only one category of speech while permitting other categories.
Similarly, the high court has held that an ordinance prohibiting newsracks with commercial solicitation handbills while permitting newsracks with newspapers in the same location is a content-based location ban. (Cincinnati v. Discovery Network, Inc., supra, 507 U.S. 410, 429-430, 113 S.Ct. 1505, 123 L.Ed.2d 99.) The court explained: "Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is `content based.'" (Id. at p. 429, 113 S.Ct. 1505.) So too here, in the locations that the ordinance has singled out, whether any particular statement by a speaker falls within the ban is determined by the content of the statement.
Both the Massachusetts Supreme Judicial Court and the United States Court of Appeals for the Second Circuit have concluded that statutes prohibiting begging but not speech on other subjects are content-based restrictions. (Benefit v. City of Cambridge, supra, 424 Mass. 918, 923-924, 679 N.E.2d 184; Loper v. New York City Police Dept., supra, 999 F.2d 699, 705.) Our own Court of Appeal has likewise concluded that a location ban on solicitation is content based. (Alternatives for California Women, Inc. v. County of Contra Costa (1983) 145 Cal.App.3d 436, 450, 193 Cal.Rptr. 384.)
The conclusion that the ordinance here is content based does not, of course, mean that the ordinance is necessarily unconstitutional under the California Constitution. Determining content neutrality is the beginning, not the end, of analyzing whether a speech restriction is constitutional. For a content-based restriction, the next step is to decide what standard such a restriction must meet to be valid under California's liberty of speech clause. If the proper test is strict scrutiny, it may well be that some or all of the ordinance's restrictions can be justified as serving a compelling governmental interest in preventing the harms caused by solicitation in the manner or at the locations specified in the ordinance and as being no broader than necessary to combat those harms. That issue, however, is beyond the scope of the question that the Ninth Circuit has certified to us. Moreover, even if the ordinance is unconstitutional, the City of Los Angeles would not be powerless to address the noncommunicative harms of solicitations. It need only do so by measures that do not single out solicitations for disfavored treatment while leaving other messages untouched (such as a prohibition of all speech at certain locations), or that make no reference to speech at all in their application (such as a prohibition on using profane, offensive, or abusive language likely to provoke an immediate violent reaction whether or not spoken in connection with a solicitation).

IV
In finding the ordinance as a whole to be content neutral, the majority relies on three United States Supreme Court cases decided under the First Amendment: Heffron v. Int'l Soc. for Krishna Consc., Inc. (1981) 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (Heffron); International Soc. For Krishna Consciousness, Inc. v. Lee (1992) 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (Lee); and United States v. Kokinda, supra, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (Kokinda). The majority's reliance is misplaced, as I explain below.
In Heffron, the high court held that a regulation prohibiting at a state fair the "`[s]ale or distribution of any merchandise, including printed or written material'" except at fixed locations approved by the fair *30 was valid under the First Amendment. (Heffron, supra, 452 U.S. 640, 643, 101 S.Ct. 2559.) The restriction was content neutral because it applied to the medium, not the message. The regulation did not prohibit solicitations not involving merchandise, much less single them out for special treatment; instead, the regulation restricted to fixed locations the entire medium of physical distribution of information. Indeed, all merchandise, not just merchandise embodying a communication, was subject to the same restriction. At one point in its decision, however, the court characterized the regulation as including a content-neutral restriction on solicitations. (Id. at pp. 648-649, 101 S.Ct. 2559.) Because the restriction in Heffron did not prohibit solicitations, much less single them out for treatment different from that accorded other types of messages, the high court's conclusory discussion in that case of whether solicitation regulations are content neutral was dictum.[5]
In Lee, the high court's decision upholding an airport solicitation ban did not address whether such location solicitation bans are content neutral. Instead, it relied on the conclusion that an airport is not a "traditional public forum." (Lee, supra, 505 U.S. 672, 680, 112 S.Ct. 2701.) Speech occurring outside of a traditional public forum is not subject to the full range of First Amendment protections. Most significantly, the First Amendment does not prohibit the government from discriminating against speech on the basis of its content if the speech occurs outside of a public forum. (Cornelius v. NAACP Legal Defense & Ed. Fund, Inc. (1985) 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567.)
In Kokinda, a plurality of the high court likewise concluded that a post office sidewalk is not a public forum. Accordingly, the plurality's conclusory statement that a ban on solicitations at that location was not content based was dictum, for that question has nothing to do with the validity of a speech restriction in a nonpublic forum. (See Kokinda, supra, 497 U.S. 720, 736, 110 S.Ct. 3115.)
I also note that when this court in deciding questions under the California Constitution adopts as an analytic tool a test the United States Supreme Court has developed to resolve similar issues under the federal Constitution, this court does not thereby passively and automatically subscribe to all applications of that test by the high court. We remain free to disagree with the high court's application of the test in various circumstances, even if we agree with its formulation of the test. In matters of state constitutional law, we need not "play Ginger Rogers to the high court's Fred Astairealways following, never leading." (People v. Cahill (1993) 5 Cal.4th 478, 558, 20 Cal.Rptr.2d 582, 853 P.2d 1037 (dis. opn. of Kennard, J.).)
In addition to the three United States Supreme Court cases just discussed, the majority relies on decisions of this court stating in general terms that solicitations are not immune from all regulation: Rescue Army v. Municipal Court (1946) 28 Cal.2d 460, 171 P.2d 8; Gospel Army v. City of Los Angeles (1945) 27 Cal.2d 232, 163 P.2d 704; and Matter of Application of Dart (1916) 172 Cal. 47, 155 P. 63. But, as Justice Mosk's dissent points out, in none of these cases were solicitation restrictions challenged as violating either the state or federal constitutional guarantees of freedom of speech. Thus, these decisions are plainly inapposite to the question presented here. Moreover, none of those cases addressed a location ban on solicitation or an aggressive solicitation ban of the type *31 at issue here. None suggested that solicitation can permissibly be subject to a location ban or aggressive solicitation restrictions to which no other messages are subject, much less that such an ordinance would be content neutral. Similarly, People v. Fogelson (1978) 21 Cal.3d 158, 145 Cal.Rptr. 542, 577 P.2d 677, another decision of this court the majority cites for the general proposition that solicitation is not immune from regulation, did not involve a location ban on solicitation or aggressive solicitation ban of the type at issue here.
No one suggests that solicitation must be utterly free of regulation. The issue here, not addressed in these prior decisions of our court, is the much narrower one of whether a government acts on the basis of content when it imposes a location ban on solicitations to which no other messages are subject, or when it punishes otherwise unprotected speech and conduct only in connection with solicitation.
Here, there is no logic to the majority's leap from the premise that solicitation is not constitutionally immune from regulation to the conclusion that therefore selectively restricting or completely prohibiting solicitation, while permitting all other speech to occur, is never content based. The majority fails to make any careful constitutional analysis of the quite distinct restrictions of the solicitation ordinance at issue here. Instead, it merges them together by referring to the ordinance as one that "single[s] out the public solicitation of funds for distinct treatment" (maj. opn., ante, 93 Cal.Rptr.2d at p. 18, 993 P.2d at p. 350)an unedifying and generalized description that obscures the different prohibitions the ordinance contains.
The majority also suggests that because the ordinance is not viewpoint based, it is not content based. It asserts that "concerns about government censorship are not raised by a regulation that, responding to the problems and hazards created by the request for an immediate contribution or transfer of money, applies to all solicitation of funds, regardless of the subject matter or viewpoint for which funds are solicited." (Maj. opn, ante, 93 Cal. Rptr.2d at p. 18, 993 P.2d at p. 349.) But a regulation may be viewpoint neutral and yet still be content based. For instance, a prohibition of all speech on the subject of the Vietnam War would be viewpoint neutral because it suppresses equally all points of view on the war, but it would be content based because it prohibits speech about the Vietnam War but not about other topics. Likewise, here the ordinance's location ban suppresses all messages of solicitation, whatever the viewpoint, but it permits all other messages to be spoken; and the aggressive solicitation ban punishes certain conduct and words only when they occur in connection with solicitation. Nor do the majority's asserted "problems and hazards" of solicitation make the ordinance content neutral. As I have explained, government may directly prohibit noncommunicative harms associated with speech but may not single out for suppression one category of speech associated with those harms.
In the end, the majority is left with nothing more than an unadorned and circular conclusion: although this court has never considered the question, the ordinance's restrictions on solicitation must be content neutral under the liberty of speech clause because we have never said such restrictions are content based.

CONCLUSION
For many people, being asked on the streets for donations or to buy goods or services is annoying, offensive, disturbing, or depressing. Those adjectives also describe much other speech to which we are unwillingly exposed. "`"If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."'" (Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., supra, 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476.) The *32 same bedrock principle underlies California's liberty of speech clause. Our liberty of speech clause permits government to regulate the time, place, and manner of speech only if it does so without regard to the content of the speaker's message. Because the ordinance of the City of Los Angeles prohibits only certain messages and not others at specified locations, and because it prohibits aggressive conduct and unprotected speech only in connection with solicitation, it suppresses speech on the basis of content and is not a contentneutral time, place, and manner regulation.

Appendix

ORDINANCE NO. 171664
An ordinance adding section 41.59 to Article I of Chapter IV of the Los Angeles Municipal Code to prohibit aggressive soliciting.
WHEREAS, it is the intent of the Council in enacting this Ordinance to improve the quality of life and economic vitality of the City, and to protect the safety of the general public against certain abusive conduct of persons engaged in solicitation, by imposing reasonable manner and place restrictions on solicitation while respecting the constitutional rights of free speech for all citizens, and
WHEREAS, the Council finds that an increase in aggressive solicitation throughout the city has become extremely disturbing and disruptive to residents and businesses, and has contributed not only to the loss of access to and enjoyment of public places, but also to an enhanced sense of fear, intimidation and disorder, and
WHEREAS, aggressive panhandling usually includes approaching or following pedestrians, the use of abusive language, unwanted physical contact, or the intentional blocking of pedestrian and vehicular traffic. The Council further finds that the presence of individuals who solicit money from persons at or near banks or automated teller machines is especially threatening and dangerous. Motorists also find themselves confronted by persons who without permission wash their automobile windows at traffic intersections, despite explicit indications by drivers not to do so. Such activity often carries with it an implicit threat to both person and property. People driving or parking on city streets frequently find themselves faced with panhandlers seeking money by offering to perform "services" such as opening car doors or locating parking spaces, and
WHEREAS, the Council further finds as abusive the solicitation of people in places where they are a "captive audience" in which it is impossible or difficult for them to exercise their own right to decline to listen to or to avoid solicitation from others. Such places include buses, subways, and trains; parking lots and structures; and indoor and outdoor dining areas. Restricting solicitation in such places will provide a balance between the rights of solicitors and the rights of persons who wish to decline or avoid such solicitations, and will help avoid or diminish the threat of violence in such unwarranted and unavoidable confrontations, and
WHEREAS, this law is timely and appropriate because current laws and city regulations are insufficient to address the aforementioned problems. The restrictions contained herein are neither overbroad nor vague and are narrowly tailored to serve a substantial governmental interest. Furthermore, in enacting this legislation, the Council recognizes the availability of community service and othersentencing alternatives, which may be appropriate remedies for violations of this law. The goal of this law is to protect citizens from the fear and intimidation accompanying certain kinds of solicitation that have become an unwelcome and overwhelming presence in the city.
NOW THEREFORE, THE PEOPLE OF THE CITY OF LOS ANGELES DO ORDAIN AS FOLLOWS:
Section 1. Chapter IV of the Los Angeles Municipal Code is hereby amended by *33 adding a new Section 41.59 thereto, to read as follows:
SEC. 41.59. PROHIBITION AGAINST CERTAIN FORMS OF AGGRESSIVE SOLICITATION.
(a) Definitions. For purposes of this section:
(1) "Solicit, ask or beg" shall include using the spoken, written, or printed word, or bodily gestures, signs or other means with the purpose of obtaining an immediate donation of money or other thing of value or soliciting the sale of goods or services.
(2) "Public place" shall mean a place to which the public or a substantial group of persons has access, and includes, but is not limited to, any street, highway, sidewalk, parking lot, plaza, transportation facility, school, place of amusement, park, playground, and any doorway, entrance, hallway, lobby and other portion of any business establishment, an apartment house or hotel not constituting a room or apartment designed for actual residence.
(b) Aggressive Solicitation prohibited.
(1) No person shall solicit, ask or beg in an aggressive manner in any public place.
(2) "Aggressive manner" shall mean any of the following:
(A) Approaching or speaking to a person, or following a person before, during or after soliciting, asking or begging, if that conduct is intended or is likely to cause a reasonable person to (i) fear bodily harm to oneself or to another, damage to or loss of property, or (ii) otherwise be intimidated into giving money or other thing of value;
(B) Intentionally touching or causing physical contact with another person or an occupied vehicle without that person's consent in the course of soliciting, asking or begging;
(C) Intentionally blocking or interfering with the safe or free passage of a pedestrian or vehicle by any means, including unreasonably causing a pedestrian or vehicle operator to take evasive action to avoid physical contact;
(D) Using violent or threatening gestures toward a person solicited either before, during, or after soliciting, asking or begging;
(E) Persisting in closely following or approaching a person, after the person solicited has been solicited and informed the solicitor by words or conduct that such person does not want to be solicited or does not want to give money or any other thing of value to the solicitor; or
(F) Using profane, offensive or abusive language which is inherently likely to provoke an immediate violent reaction, either before, during, or after solicitation.
(c) All solicitation prohibited at specified locations.
(1) Banks and ATMs. No person shall solicit, ask or beg within 15 feet of any entrance or exit of any bank, savings and loan association, credit union, or check cashing business during its business hours or within 15 feet of any automated teller machine during the time it is available for customers' use. Provided, however, that when an automated teller machine is located within an automated teller machine facility, such distance shall be measured from the entrance or exit of the automated teller machine facility. Provided further that no person shall solicit, ask or beg within an automated teller machine facility where a reasonable person would or should know that he or she does not have the permission to do so from the owner or other person lawfully in possession of such facility. Nothing in this paragraph shall be construed to prohibit the lawful vending of goods and services within such areas.
(A) Definitions. For purposes of this section:
(i) "Bank" means any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution *34 organized or operated under the laws of the United States, and any bank the deposits of which are insured by the Federal Deposit Insurance Corporation.
(ii) "Savings and loan association" means any federal savings and loan association and any "insured institution" as defined in Section 401 of the National Housing Act, as amended, and any federal credit union as defined in Section 2 of the Federal Credit Union Act.
(hi) "Credit union" means any federal credit union and any state-chartered credit union the accounts of which are insured by the Administrator of the National Credit Union Administration.
(iv) "Check cashing business" means any person duly licensed as a check seller, bill payer, or prorater pursuant to Division 3 of the California Financial Code, commencing with section 12000.
(v) "Automated teller machine" shall mean any electronic information processing device which accepts or dispenses cash in connection with a credit, deposit, or convenience account.
(vi) "Automated teller machine facility" shall mean the area comprised of one or more automated teller machines, and any adjacent space which is made available to banking customers after regular banking hours.
(B) Exemptions. The provisions of subdivision (c)(1) shall not apply to any unenclosed automated teller machine located within any building, structure or space whose primary purpose or function is unrelated to banking activities, including but not limited to supermarkets, airports and school buildings, provided that such automated teller machine shall be available for use only during the regular hours of operation of the building, structure or space in which such machine is located.
(2) Motor vehicles and parking lots.
(A) Motor vehicles. No person shall approach an operator or occupant of a motor vehicle for the purpose of soliciting, asking or begging while such vehicle is located in any public place.
(B) Parking lots. No person shall solicit, ask or beg in any public Parking lot or structure any time after dark. "After dark" means any time from one-half hour after sunset to one-half hour before sunrise.
(C) Exemptions. Subdivision (c)(2) shall not apply to any of the following:
(i) to solicitations related to business which is being conducted on the subject premises by the owner or lawful tenants;
(ii) to solicitations related to the lawful towing of a vehicle; or
(iii) to solicitations related to emergency repairs requested by the operator or other occupant of a vehicle.
(3) Public transportation vehicles and stops.
(A) "Public transportation vehicle" shall mean any vehicle, including a trailer bus, designed, used or maintained for carrying 10 or more persons, including the driver; or a passenger vehicle designed for carrying fewer than 10 persons, including the driver, and used to carry passengers for hire.
(B) Any person who solicits, asks or begs in any public transportation vehicle, or within ten feet of any designated or posted public transportation vehicle stop, is guilty of a violation of this section if:
(i) He or she remains there after being asked to leave by the owner, driver, or operator of a public transportation vehicle; the agent of the owner, driver or operator of a public transportation vehicle; the owner or manager of a public transportation facility; the agent of the owner or manager of a public transportation facility; a member of a security force employed by the public transportation facility; or by a peace officer, as defined in Chapter 4.5 of Title 3 of the California Penal Code (commencing with Pen.Code, § 830); or

*35 (ii) Within the immediately preceding 30 days, he or she engaged in a solicitation at that location and had been asked to leave by a person specified in subdivision (c)(3)(B)(i), above.
(iii) Subdivision (c)(3)(B)(ii) is not violated if a person who has been requested to leave enters the property within the designated period and solicits, asks, or begs with the express authorization of a person specified in subdivision (c)(3)(B)(i).
(4) Restaurants. Any person who solicits, asks, or begs in any outdoor or indoor dining area of a restaurant or other establishment serving food for immediate consumption is guilty of a violation of this section if:
(A) He or she remains there after being asked to leave by the owner, manager or supervisor of the restaurant or other food establishment; the agent of the owner, manager or supervisor of the restaurant; a member of a security force employed by the restaurant; or by a peace officer, as defined in Chapter 4.5 of Title 3 of the California Penal Code (commencing with Pen.Code, § 830), acting at the request of any of the persons specified in this subdivision; or
(B) Within the immediately preceding 30 days, he or she engaged in a solicitation at that location and had been asked to leave by a person specified in subdivision (c)(4)(A), above.
(C) Subdivision (c)(4)(B) is not violated if a person who has been requested to leave enters the property within the designated period and solicits, asks, or begs with the express authorization of a person specified in subdivision (c)(4)(A).
(d) Penalty. A violation of this Section is punishable as a misdemeanor or chargeable at the City Attorney's discretion.
(e) Severability. The provisions of this ordinance are declared to be separate and severable. The invalidity of any clause, sentence, paragraph, subdivision, section or portion of this ordinance, or the invalidity of the application thereof to any person or circumstance shall not affect the validity of the remainder of this ordinance, or the validity of its application to other persons or circumstances.
(f) Non-exclusivity. Nothing in this chapter shall limit or preclude the enforcement of other applicable laws.
Sec[tion] 2. The City Clerk shall certify to the passage of this ordinance and cause the same to be published in some daily newspaper printed and published in the City of Los Angeles.
I hereby certify that the foregoing ordinance was introduced at the meeting of the Council of the City of Los Angeles JUN 25 1997 and was passed at its meeting of JUL 02 1997
J. MICHAEL CAREY, City Clerk
By /s/ Diane M. Titus
 Deputy
Approved JUL 15 1997
/s/ Richard J. Riordan
 Mayor
/s/ Joel Wachs
/s/ Richard Alarcon
/s/ Richard Alatorre
Approved as to Form and Legality
/s/ James K. Hahn
James K. Hahn, City Attorney
By /s/ Earl E. Thomas JUL 7 1997
EARL E. THOMAS,
Assistant City Attorney
NOTES
[1] For the latter proposition, the Ninth Circuit cited Xiloj-Itzep v. City of Agoura Hills (1994) 24 Cal.App.4th 620, 29 Cal.Rptr.2d 879 (Xiloj-Itzep ) (finding a solicitation regulation to be content neutral under the First Amendment), and City of Fresno v. Press Communications, Inc. (1994) 31 Cal.App.4th 32, 36 Cal.Rptr.2d 456 (City of Fresno) (finding a regulation of door-to-door distribution of advertisements and nonsubscription newspapers to be content based under the California and federal Constitutions). (Los Angeles Alliance I, supra, 157 F.3d 1162, 1165.) In a footnote, the Ninth Circuit observed that, in addition to the decision below, three federal district court opinions have heldbased upon Alternatives, supra, 145 Cal.App.3d 436, 193 Cal.Rptr. 384 and Carreras, supra, 768 F.2d 1039that regulations of solicitation are content based (and hence subject to strict scrutiny) under the California Constitution (International Society for Krishna Consciousness of California, Inc. v. City of Los Angeles (C.D.Cal.1997) 966 F.Supp. 956, 969 (ISKCon); Berkeley Community Health Project v. City of Berkeley (N.D.Cal.1995) 902 F.Supp. 1084, 1090 (Berkeley Community); Church of the Soldiers of the Cross of Christ of the State of California v. City of Riverside (C.D.Cal. 1995) 886 F.Supp. 721, 725 (Church of the Soldiers)), and that one such decision has upheld a regulation prohibiting "abusive solicitation" under the First Amendment (Doucette v. City of Santa Monica (C.D.Cal. 1997) 955 F.Supp. 1192 (Doucette)) with no discussion of the California Constitution. (Los Angeles Alliance I, supra, 157 F.3d at p. 1165, fn. 4.)
[2] We recast the question to avoid prematurely restricting the analysis of the state constitutional claim to the terminology contained in the certification request. Our order requested "[t]he certifying court ... to notify this court within 10 days should it have any objection to this court's restatement of the certified question. Briefing shall be deferred pending further order of this court...."

After receiving written notice from the Ninth Circuit that it had "no objection" to the restatement of the certified question, we ordered briefing on the above stated question. Briefing was conducted consistently with California Rules of Court, rule 29.3 (see former rule 29.5(g)(1)), now rule 29.5(h)(1)) as follows: City of Los Angeles et al., defendants and appellants, filed an opening brief on the merits. Subsequently, Los Angeles Alliance for Survival et al., plaintiffs and respondents, filed a brief on the merits, after which defendants filed a reply brief. We thereafter granted the requests of six separate entities to each file an amicus curiae brief, and then allowed the parties to respond to all such briefs in consolidated reply briefs.
After reviewing the briefs and the case law, we have concluded that the state law question before us properly may be analyzed by reference to the "content based" terminology contained in the original question, and hence this opinion answers that specific question.
[3] On the last point, the Ohio Supreme Court noted in Scott v. Bank One Trust Co., N.A. (1991) 62 Ohio St.3d 39, 577 N.E.2d 1077, 1080, that its state's sovereignty "is unquestionably implicated when federal courts construe state law" because if the federal court errs, "it applies law other than Ohio law, in derogation of the state's right to prescribe a `rule of decision.'"
[4] Obtaining federal jurisdiction over the state constitutional claim is a simple matter of joining the state constitutional claim with a claim under the First Amendment.
[5] As the Elliott decision observes, courts regularly render what might be viewed as "advisory" opinions in certain situations, for example in matters that have become moot while the appeal is pending. (See Elliott, supra, 446 P.2d at p. 355 et seq.; see also, e.g., NBC Subsidiary (KNBC-TV), Inc. v. Superior Court (1999) 20 Cal.4th 1178, 1190, fn. 6, 86 Cal. Rptr.2d 778, 980 P.2d 337; In re Kieshia E. (1993) 6 Cal.4th 68, 74, fn. 5, 23 Cal.Rptr.2d 775, 859 P.2d 1290, and cases cited; Dix v. Superior Court (1991) 53 Cal.3d 442, 454, 279 Cal.Rptr. 834, 807 P.2d 1063, and cases cited.)
[6] Likewise, it has been observed that such an ordinance implicates the First Amendment. The United States Supreme Court has held that charitable solicitation of funds is "a form of speech protected under the First Amendment" (International Society For Krishna Consciousness v. Lee (1992) 505 U.S. 672, 677, 112 S.Ct. 2701, 120 L.Ed.2d 541 (Lee); see also Kokinda, supra, 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571; Riley v. National Federation of Blind (1988) 487 U.S. 781, 788-789, 108 S.Ct. 2667, 101 L.Ed.2d 669 (Riley); Schaumburg v. Citizens for a Better Environ. (1980) 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (Schaumburg); Heffron v. International Society for Krishna Consciousness, Inc. (1981) 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (Heffron )), and we have held that the First Amendment protects the sale of printed material on public sidewalks. (Welton v. City of Los Angeles (1976) 18 Cal.3d 497, 504, 134 Cal.Rptr. 668, 556 P.2d 1119 et seq.)
[7] As we observed in Dulaney, supra, 11 Cal.3d 77, 112 Cal.Rptr. 777, 520 P.2d 1, our formulation of the time, place, and manner test was "fashioned from a long line of United States Supreme Court cases" (id., at p. 84, 112 Cal. Rptr. 777, 520 P.2d 1), and as noted in Savage, supra, 223 Cal.App.3d 1562, 273 Cal. Rptr. 302, analysis of speech regulation under article I, section 2, employs "time, place and manner restrictions . . . measured by federal constitutional standards." (223 Cal.App.3d at p. 1572, 273 Cal.Rptr. 302.) The high court continues to employ the same formulation set out above in its time, place, and manner inquiry. (See, e.g., Ward v. Rock Against Racism (1989) 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (Ward).)
[8] As has been observed with respect to the same inquiry under the First Amendment, the content-neutral/content-based "distinction has enjoyed growing prominence as a judicial tool for categorizing government actions regarding expression and for justifying the level of scrutiny applied to those actions." (Williams, Content Discrimination and the First Amendment (1991) 139 U.Pa. L.Rev. 615, 616 (Williams).)
[9] The California free speech provision was modeled verbatim upon article I, section 8 of the New York Constitution of 1846 (see Fritz, More Than "Shreds and Patches": California's First Bill of Rights (1989) 17 Hast. Const. L.Q. 13, 23 & fn. 45), which in turn was derived from article VII, section 8 of the New York Constitution of 1821. At the time of California's 1849 Constitution, most of the states then in the Union had constitutional provisions similar to the New York model. (1-7 Thorpe, The Federal and State Constitutions, Colonial Charters, and Other Organic Laws (1909).) That model, in turn, may have been derived from Blackstone's formulation of the common law. (See 4 Blackstone, Commentaries 151-152 ["Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity."].)

The California free speech provision subsequently was carried over again, without substantive debate into the Constitution of 1879 (see, e.g., 1 & 3, Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878-1879, at pp. 150, 221, 1178 [introduction of proposed provisions and debate thereon] & 1522 [describing "principal changes" made in art. I as adopted] (Willis & Stockton, Debates and Proceedings (1878-1879)), and, with only minor grammatical change, into the constitutional revisions adopted November 5, 1974 (see Cal. Const. Revision Com., Proposed Revision, art. I, § 11, pt. 5 (1971), p. 23 (Proposed Revision) [setting forth proposed art. I, § 11, which became the present art. I, § 2(a) ]).
[10] Forty other current state constitutions fall into this category. (See Constitutions of the United States, National and State (2d ed.1978); see also Ex Parte Tucci (Tex. 1993) 859 S.W.2d 1, 37-58 (cone. opn. of Phillips, C.J.) [appendix quoting all former and then-current free speech clauses of all state constitutions].)
[11] At least one state with a provision similar to ours has found it to be, as a general matter, no broader than the First Amendment. (E.g., Eastwood Mall, Inc. v. Slanco (1994) 68 Ohio St.3d 221, 626 N.E.2d 59, 61.)
[12] In some areas we have found that the protection afforded by the California liberty of speech clause is coterminous with that provided by the federal Constitution. (E.g., Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 745-746, 257 Cal.Rptr. 708, 771 P.2d 406 [applying 1st Amend, standards in defamation action under art. I, § 2].)
[13] In Ward, the court cited in support Renton v. Playtime Theatres, Inc. (1986) 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (Renton ), which concerned a zoning ordinance restricting the locations of adult theaters. There, in response to Justice Brennan's assertion that "[t]he ordinance discriminates on its face against certain forms of speech based on content" (id., at p. 57, 106 S.Ct. 925 (dis. opn. of Brennan, J.)), the court conceded that the ordinance "treats theaters that specialize in adult films differently from other kinds of theaters" (id., at p. 47, 106 S.Ct. 925), but, referring to its "so-called `content neutral'" rule (id., at p. 47, 106 S.Ct. 925), found the ordinance was "aimed not at the content of the films shown at `adult motion picture theaters,' but rather at the secondary effects of such theaters on the surrounding community." (Ibid., italics in original.) The court upheld the ordinance as being "completely consistent with our definition of `content-neutral' speech regulations as those that `are justified without reference to the content of the regulated speech.'" (Id., at p. 48, 106 S.Ct. 925, italics in original.)
[14] Neither the plurality in Kokinda, supra, 497 U.S. 720, 110 S.Ct. 3115, nor Justice Kennedy's concurring opinion in that case, directly responded to the argument of the dissent. We observe that the position set forth by the dissent in Kokinda seems inconsistent with the high court's unanimous conclusion in Heffron, supra, 452 U.S. 640, 101 S.Ct. 2559.
[15] The only decision concerning a solicitation regulation that appears to hold to the contrary under the First Amendment, Blair v. Shanahan (N.D.Cal.1991) 775 F.Supp. 1315, was remanded to the trial court (Blair v. Shanahan (9th Cir.1994) 38 F.3d 1514), after which the original opinion and order was vacated. (Blair v. Shanahan (N.D.Cal.1996) 919 F.Supp. 1361.)
[16] The court further explained in Wirta: "A minimum of imagination is required to illustrate the paradoxical scope of the district's policy. A cigarette company is permitted to advertise the desirability of smoking its brand, but a cancer society is not entitled to caution by advertisement that cigarette smoking is injurious to health. A theater may advertise a motion picture that portrays sex and violence, but the Legion for Decency has no right to post a message calling for clean films. A lumber company may advertise its wood products, but a conservation group cannot implore citizens to write to the President or Governor about protecting our natural resources. An oil refinery may advertise its products, but a citizens' organization cannot demand enforcement of existing air pollution statutes. An insurance company may announce its available policies, but a senior citizens' club cannot plead for legislation to improve our social security program. The district would accept an advertisement from a television station that is commercially inspired, but would refuse a paid nonsolicitation message from a strictly educational television station. Advertisements for travel, foods, clothing, toiletries, automobiles, legal drugs  all these are acceptable, but the American Legion would not have the right to place a paid advertisement reading, `Support Our Boys in Viet Nam. Send Holiday Packages.'" (Wirta, supra, 68 Cal.2d 51, 57-58, 64 Cal.Rptr. 430, 434 P.2d 982.)
[1] The majority overlook Village of Schaumburg v. Citizens for Better Environ. (1980) 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73, which calls into question the continued validity of these early cases. In Schaumburg, the United States Supreme Court invalidated an ordinance prohibiting in-person solicitation by use of public streets and public ways by charitable organizations that failed to meet strict requirements for obtaining a permit. The court made clear therein that appeals for funds by charitable or religious groups, whether door-to-door or on-street, involve a variety of speech interests that are within the protection of the First Amendment. (Id. at p. 632, 100 S.Ct. 826.) Any regulation "must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." (Ibid.) The village could not, consistently with the First Amendment, "label such groups [as] `fraudulent' and bar them from canvassing on the streets and house to house." (Id. at p. 636, 100 S.Ct. 826.)
[1] The liberty of speech clause of the California Constitution, article I, section 2, subdivision (a), states in full: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."
[2] United States Supreme Court Justice Kennedy has suggested that under the federal Constitution content-based regulations should not be judged by the strict scrutiny balancing test but should be generally forbidden, with a few exceptions for obscenity, defamation, and other well-defined categories of traditionally proscribable speech. (See generally Simon & Schuster, Inc. v. Members of N.Y. Crime Victims Bd., supra, 502 U.S. 105, 124-128, 112 S.Ct. 501, 116 L.Ed.2d 476 (cone. opn. of Kennedy, J.) [asserting that, under the First Amendment, existence of a compelling governmental interest does not legitimize content-based discrimination].)
[3] The ordinance's location restriction applies not only to traditional public fora like streets and sidewalks but also to other areas like restaurants and private parking garages. To the extent that the ordinance reaches solicitation on private property not subject to the protections of article I section 2 of the California Constitution, it is not objectionable under that constitutional provision. (See Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908-910, 153 Cal.Rptr. 854, 592 P.2d 341 [discussing circumstances in which art. I § 2 applies to private property].)
[4] The exception is the prohibition on blocking passage of pedestrians or vehicles, which is not linked to solicitation or any other category of speech, and therefore is content neutral to the extent it restricts speech at all.
[5] Additionally, if the United States Supreme Court were faced with the facts of Heffron, supra, 452 U.S. 640, 101 S.Ct. 2559, today, it probably would conclude a state fair is not a traditional public forum and therefore speech at a state fair may be restricted by content, given the court's holdings after Heffron that airports and the sidewalks of post offices are not public fora (Lee, supra, 505 U.S. 672, 680, 112 S.Ct. 2701; Kokinda, supra, 497 U.S. 720, 727-730, 110 S.Ct. 3115).